**WO**

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF ARIZONA**

| | |
|---|---|
| Robert Wayne Murray, | No. CV-99-1812-PHX-DGC |
| Petitioner, | <u>DEATH PENALTY CASE</u> |
| vs. | |
| Dora B. Schriro, et al., | **MEMORANDUM OF DECISION AND ORDER** |
| Respondents. | |

Petitioner Robert Wayne Murray has filed an amended petition for writ of habeas corpus. Dkt. 20.[1] Petitioner alleges, pursuant to 28 U.S.C. § 2254, that he was convicted and sentenced to death in violation of the United States Constitution. *Id.* In an Order dated April 14, 2006, the Court found that Claims 1, 3, 5, 7, 10, 12, 22, 29, 30-37, 39, and 40 were, in part, properly exhausted. Dkt. 94. The Court ordered briefing on the merits of the claims, and on Petitioner's requests for evidentiary development.[2] *Id.* The parties have completed their briefing. Dkts. 111, 114, 117. For the reasons set forth below, the Court concludes that Petitioner is not entitled to habeas corpus relief or further evidentiary development.

---

[1] "Dkt." refers to the documents in this Court's file.

[2] Petitioner's merits brief does not address Claim 5, alleging a violation of his right under the Sixth Amendment to "a proper jury pool representing a fair cross-section of the community." Dkt. 20 at 43. The claim is therefore waived.

**BACKGROUND**

Dean Morrison, age 65, and Jacqueline Appelhans, age 60, lived at and operated a store and restaurant at Grasshopper Junction, a rural area outside of Kingman, Arizona.[3] At around 8:30 or 9:00 on the morning of May 14, 1991, a delivery man arrived at their property and found their bodies lying face down and clad in bathrobes on the living room floor of Morrison's residence. Appelhans's left hand was clutching Morrison's right arm. Both victims had been shot multiple times in the head.

Sometime before 8:00 that morning, police had found one of Morrison's tow trucks abandoned on Interstate 40 westbound near Kingman. At approximately 8:00 that morning, police also had arrested Petitioner and his younger brother, Roger, on unrelated charges. The arrests occurred on eastbound I-40 near Holbrook, Arizona. When arrested, the Murrays had in their possession firearms and other evidence linking them to the murders at Grasshopper Junction.

When officers arrived to investigate the murder scene, they found a revolver on the couch and a .22 semiautomatic rifle leaning against the wall. Shotgun pellets and various .22- and .38-caliber bullets, casings, and shells were found near the bodies.

Drawers in the living room had been pulled open and the contents strewn about. The bedrooms and kitchen were ransacked. A cushion cover was missing from the couch. There was a .303 rifle on a bed and $172 on a desk chair. Loose change and a single roll of coins were on the kitchen floor. Morrison's wallet, undisturbed in the pocket of his pants, contained $800.

The drawer from the store's cash register had been removed. Packs of Marlboro cigarettes were left in paper bags in the store, and the gasoline register was turned on.

---

[3] Except where otherwise indicated, this factual summary is taken from the decision of the Arizona Supreme Court in *State v. Murray*, 184 Ariz. 9, 20-21, 906 P.2d 542, 553-54 (1995).

Police found Morrison's glasses, a flashlight, and a set of keys on the patio of the store. Three live .38-caliber bullets were found near the gas pumps. Morrison's sister found a fired .25 bullet in the pantry two weeks after the crime.

Detective Dale Lent of the Mohave County Sheriff's Department documented the tracks around the scene. He found four sets of footprints, two of which were made by the victims. Of the other sets, one was made by a pair of cowboy boots, consistent with those worn by Petitioner, the other by a pair of tennis shoes, consistent with those worn by Roger Murray. Officers photographed and sketched the footprints. Other than the shoe prints of the officers and victims, the Murrays' footprints were the only prints to enter or leave the crime scene. One trail showed three sets of prints: the tennis shoes, the boots, and Morrison's slippers. The prints suggested that Morrison had resisted his attackers.

Rolled and loose coins were found in the courtyard amidst footprints of the victims and the Murrays. Both brothers' footprints, as well as Morrison's, were found near a backhoe, along with tire tracks later determined to be from the tow truck found on westbound I-40.

On the morning of their arrest, the Murrays were driving eastbound on I-40 in a 1988 Ford Tempo with Alabama plates. For reasons unrelated to the homicide and not disclosed to the jury, an officer attempted to stop them. With Petitioner driving, the Murrays fled in their car, reaching speeds in excess of 85 miles an hour, leaving the highway, running a manned and armed roadblock, and stopping off-road only when a wash blocked their way. As they exited the vehicle, Petitioner tossed away a .38 revolver that contained four bullets; Roger Murray threw out a loaded .25 semiautomatic pistol. Petitioner had two spent shotgun shell casings in his hip pocket.

Inside the vehicle, officers found a loaded twelve gauge sawed-off shotgun along with live double-ought buckshot shells. There was also a checkered cushion cover, matching the cushion on Morrison's couch, which contained rolled coins stamped with the

name and address of Morrison's business, along with a pillow case containing approximately $1400 in coin rolls and $3300 in cash.  Gloves were found, as well as a receipt from the Holiday House Motel in Kingman, dated May 12, 1991.  Motel records showed that the brothers had listed a 1988 Ford on the hotel registration card and had checked out on May 13.  In a road atlas found in the car, circles were drawn around the locations of two rural shops or restaurants, including Grasshopper Junction, that were not otherwise indicated on the map.

Keys recovered from Petitioner's pocket were later determined to fit a 1991 Chevy Pickup that was on Morrison's property.  A scanner found in the Murray's car fit the empty bracket of the tow truck found on westbound I-40.

Morrison's autopsy revealed that he had suffered a shotgun blast that entered behind his left ear from a distance of about three feet, shattering his skull.  He also suffered two gunshot wounds from a large caliber pistol, one entering the left lower neck, the other the right temple.  A .38 bullet was recovered from the back of his neck.  Large caliber buckshot was removed from his head.  A fired .38 bullet was found next to Morrison.  Morrison also had lacerations and abrasions on his face, elbow, forearm, knee, and thigh.  These injuries occurred in the same time frame as the gunshot wounds.

Appelhans was shot with at least three different guns.  Her head had been shattered by a blast from a shotgun.  Brain and scalp tissue were found on the couch and the surrounding area.  Two .38-caliber slugs were removed from her skull.  She also suffered .22-caliber wounds that entered at the back of the neck and exited her face.  A fragment of one of the .22 bullets was found in her right hand.  An aspiration hemorrhage in her lungs suggested a lapse of time between the initial gunshot and death.  The .38-caliber bullets were a possible cause of death, and the shotgun blast was clearly lethal.  The effect of the .22 shots could not be determined, and the autopsy did not reveal the sequence of the shots.

Casings found at the crime scene and in Petitioner's pocket were fired by the three

guns found with the Murrays.  Other bullets, slugs, and casings were inconclusive as to the weapons that fired them; some had characteristics that were consistent with being fired by the weapons.

Human blood and tissue were found on Petitioner's shirt, on his brother's pants, and on the cushion cover.  The blood on Roger Murray's pants could have come from either victim or Petitioner, but not from Roger Murray.  The blood on Petitioner's shirt was consistent with that of either victim, but not with the blood of Petitioner or Roger Murray. The blood on the cushion could have come from Appelhans, but not from Morrison, Petitioner, or Roger Murray.  DNA tests were not conducted.

The brothers were tried together.  On June 12, 1992, a jury convicted them of the first degree murders of Morrison and Appelhans and the armed robbery of Morrison. The first degree murder verdicts were unanimous for both premeditated and felony murder. Following bifurcated sentencing hearings, the trial court found that the State had proven three aggravating circumstances as to each defendant:  the murders were committed for pecuniary gain, pursuant to A.R.S. § 13-703(F)(5); the murders were especially heinous, cruel or depraved, under § 13-703(F)(6); and the defendants committed multiple homicides, under § 13-703(F)(8).  With respect to each brother, the trial court found insufficient mitigation to warrant leniency.  The Arizona Supreme Court affirmed the convictions and death sentences.  *State v. Murray*, 184 Ariz. 9, 906 P.2d 542 (1995).

On January 21, 1997, Petitioner filed a petition for postconviction relief ("PCR") with the trial court ("PCR court").[4]  The PCR court summarily rejected or found precluded as waived most of Petitioner's claims, but held an evidentiary hearing regarding one claim

---

[4] The Honorable James E. Chavez presided over both the trial and the PCR proceedings.

of ineffective assistance of counsel ("IAC").  ME 4/24/97.[5]  The PCR court denied relief on that claim following the evidentiary hearing.  ME 3/25/98.  The Arizona Supreme Court summarily denied a petition for review, and Petitioner commenced these proceedings.

## AEDPA STANDARD FOR RELIEF

Petitioner's habeas claims are governed by the applicable provisions of the Antiterrorism and Effective Death Penalty Act (AEDPA).  *See Lindh v. Murphy*, 521 U.S. 320, 336 (1997).  The AEDPA established a "substantially higher threshold for habeas relief" with the "acknowledged purpose of 'reducing delays in the execution of state and federal criminal sentences.'"  *Schriro v. Landrigan*, 127 S. Ct. 1933, 1939-40 (2007) (quoting *Woodford v. Garceau*, 538 U.S. 202, 206 (2003)).  The AEDPA's "'highly deferential standard for evaluating state-court rulings' . . . demands that state-court decisions be given the benefit of the doubt."  *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002) (per curiam) (quoting *Lindh*, 521 U.S. at 333 n.7).

Under the AEDPA, a petitioner is not entitled to habeas relief on any claim "adjudicated on the merits" by the state court unless that adjudication:

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

The phrase "adjudicated on the merits" refers to a decision resolving a party's claim which is based on the substance of the claim rather than on a procedural or other non-

---

[5] "ME" refers to the minute entries of the state court, "RT" to the state court reporter's transcript, and "ROA" to the record on appeal from trial and sentencing prepared for Petitioner's direct appeal to the Arizona Supreme Court (Case No. CR-92-440-AP).  The original reporter's transcripts and certified copies of the trial and post-conviction records were provided to this Court by the Arizona Supreme Court.  *See* Dkt. 50.

substantive ground. *Lambert v. Blodgett*, 393 F.3d 943, 969 (9th Cir. 2004). The relevant state court decision is the last reasoned state decision regarding a claim. *Barker v. Fleming*, 423 F.3d 1085, 1091 (9th Cir. 2005) (citing *Ylst v. Nunnemaker*, 501 U.S. 797, 803-04 (1991)); *Insyxiengmay v. Morgan*, 403 F.3d 657, 664 (9th Cir. 2005).

"The threshold question under AEDPA is whether [the petitioner] seeks to apply a rule of law that was clearly established at the time his state-court conviction became final." *Williams v. Taylor*, 529 U.S. 362, 390 (2000). Therefore, to assess a claim under subsection (d)(1), the Court must first identify the "clearly established Federal law," if any, that governs the sufficiency of the claims on habeas review. "Clearly established" federal law consists of the holdings of the Supreme Court at the time the petitioner's state court conviction became final. *Williams*, 529 U.S. at 365; *see Carey v. Musladin*, 127 S. Ct. 649, 653 (2006); *Clark v. Murphy*, 331 F.3d 1062, 1069 (9th Cir. 2003). Habeas relief cannot be granted if the Supreme Court has not "broken sufficient legal ground" on a constitutional principle advanced by a petitioner, even if lower federal courts have decided the issue. *Williams*, 529 U.S. at 381; *see Musladin*, 127 S. Ct. at 654; *Casey v. Moore*, 386 F.3d 896, 907 (9th Cir. 2004). Nevertheless, while only Supreme Court authority is binding, circuit court precedent may be "persuasive" in determining what law is clearly established and whether a state court applied that law unreasonably. *Clark*, 331 F.3d at 1069.

The Supreme Court has provided guidance in applying each prong of § 2254(d)(1). The Court has explained that a state court decision is "contrary to" the Supreme Court's clearly established precedents if the decision applies a rule that contradicts the governing law set forth in those precedents, thereby reaching a conclusion opposite to that reached by the Supreme Court on a matter of law, or if it confronts a set of facts that is materially indistinguishable from a decision of the Supreme Court but reaches a different result. *Williams*, 529 U.S. at 405-06; *see Early v. Packer,* 537 U.S. 3, 8 (2002) (per curiam). In characterizing the claims subject to analysis under the "contrary to" prong, the Court has

observed that "a run-of-the-mill state-court decision applying the correct legal rule to the facts of the prisoner's case would not fit comfortably within § 2254(d)(1)'s 'contrary to' clause." *Williams*, 529 U.S. at 406; *see Lambert*, 393 F.3d at 974.

Under the "unreasonable application" prong of § 2254(d)(1), a federal habeas court may grant relief where a state court "identifies the correct governing legal rule from [the Supreme] Court's cases but unreasonably applies it to the facts of the particular . . . case" or "unreasonably extends a legal principle from [Supreme Court] precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply." *Williams*, 529 U.S. at 407. For a federal court to find a state court's application of Supreme Court precedent "unreasonable" under § 2254(d)(1), the petitioner must show that the state court's decision was not merely incorrect or erroneous, but "objectively unreasonable." *Id.* at 409; *Landrigan*, 127 S. Ct. at 1939; *Visciotti*, 537 U.S. at 25.

Under the standard set forth in § 2254(d)(2), habeas relief is available only if the state court decision was based on an unreasonable determination of the facts. *Miller-El v. Dretke*, 545 U.S. 231, 240 (2005) (*Miller-El II*). A state court decision "based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state-court proceeding." *Miller-El*, 537 U.S. 322, 340 (2003) (*Miller-El I*); *see Taylor v. Maddox*, 366 F.3d 992, 999 (9th Cir. 2004). In considering a challenge under § 2254(d)(2), state court factual determinations are presumed to be correct, and a petitioner bears the "burden of rebutting this presumption by clear and convincing evidence." 28 U.S.C. § 2254(e)(1); *Landrigan*, 127 S. Ct. at 1939-40; *Miller-El II*, 545 U.S. at 240. But it is only the state court's factual findings, not its ultimate decision, that are subject to 2254(e)(1)'s presumption of correctness. *Miller-El I,* 537 U.S. at 341-42 ("The clear and convincing evidence standard is found in § 2254(e)(1), but that subsection pertains only to state-court determinations of factual issues, rather than decisions.").

As the Ninth Circuit has noted, application of the foregoing standards presents difficulties when the state court decided the merits of a claim without providing its rationale. *See Himes v. Thompson*, 336 F.3d 848, 853 (9th Cir. 2003); *Pirtle v. Morgan*, 313 F.3d 1160, 1167 (9th Cir. 2002); *Delgado v. Lewis*, 223 F.3d 976, 981-82 (9th Cir. 2000). In those circumstances, a federal court independently reviews the record to assess whether the state court decision was objectively unreasonable under controlling federal law. *Himes*, 336 F.3d at 853; *Pirtle*, 313 F.3d at 1167. Although the record is reviewed independently, a federal court nevertheless defers to the state court's ultimate decision. *Pirtle*, 313 F.3d at 1167 (citing *Delgado*, 223 F.3d at 981-82); *see also Himes*, 336 F.3d at 853. Only when a state court did not decide the merits of a properly raised claim will the claim be reviewed de novo, because in that circumstance "there is no state court decision on [the] issue to which to accord deference." *Pirtle*, 313 F.3d at 1167; *see also Menendez v. Terhune*, 422 F.3d 1012, 1025-26 (9th Cir. 2005); *Nulph v. Cook*, 333 F.3d 1052, 1056-57 (9th Cir. 2003).

## DISCUSSION

**I.    Claim 1**

Petitioner alleges that his rights under the Sixth and Fourteenth Amendments were violated by the trial court's denial of his motion to change venue.   Dkt. 111 at 8-18.

    **A.**    <u>Background</u>

On April 20, 1992, Petitioner filed a motion for change of venue arguing that he would be "unable to receive a fair trial in Mohave County due to the massive amounts of prejudicial pre-trial publicity this case has engendered." ROA 107; *see* ROA 92. The trial court held an evidentiary hearing April 22, 1992. At the hearing, David Hawkins, a news director and reporter at radio stations in Mohave County, provided the scripts of the approximately sixty news reports he had written about the case in the year since the murders. ROA, Index of Exhibits, 4/22/92. Hawkins also described his observations of the community's feeling about the case, testifying that people were angry about what had

happened to the victims.  RT 4/22/92 at 24.  He also indicated that, based on his contacts with a "couple dozen" individuals, mostly people in the legal community, the general opinion was that the Murrays were guilty.  *Id.* at 24-25.  Hawkins was unable to provide information regarding the circulation of the newspapers or the listening audience of the radio stations.  *Id.* at 38-39.  Along with the news scripts prepared by Hawkins, defense counsel submitted copies of eight articles from the Kingman Daily Miner newspaper.  ROA, Index of Exhibits, 4/22/92.

John Collier Freeman, an investigator for the Mohave County Legal Defender's Office, also testified at the hearing.  According to Freeman, in the course of his investigative duties he had spoken about the case to approximately 100 people in the county (RT 4/22/92 at 47) and had received a number of unsolicited comments on the case from a cross-section of the community (*id.* at 42-43).  Freeman testified that most of the people who expressed an opinion believed that the brothers were guilty.  *Id.* at 43-44.

At the close of the hearing, defense counsel asked the court to defer ruling its ruling on the change-of-venue motion until the results of the juror questionnaires were available.  *Id.* at 102.  While agreeing to reserve its ruling, the court noted:

> Well, based on the evidence I have heard today, I'm not convinced that a change of venue is required.  First of all, this is – probably most people would call this a rural county, but I agree with the State, there are three separate metropolitan areas.  There is an abundance of news sources in those areas, and I'm not convinced that we cannot find, out of the population of this county, a fair and impartial jury. . . .[I]f we have difficulty finding a jury out of the jury pool, then I may take up that motion again, but based on the evidence I've heard today I don't think the defendants have carried the burden of proof.

*Id.* 110-11; *see* ME 4/22/92 at 2.

After voir dire, Petitioner's counsel renewed her request for a change of venue.  RT 5/29/92, Vol. II, at 24.  The court denied the motion, explaining:

> I don't see that there's any need for further discussion on it.  We were able to impanel a jury.  My assessment is probably not real accurate, but my recollection is that there were probably half the people or less that knew about

the case, and most of them had trouble recounting much about it.  So, jury selection went – was much easier than I anticipated based on the amount of media coverage.

*Id.*

On direct appeal, the Arizona Supreme Court rejected Petitioner's claim that he was entitled to a change of venue, finding that Petitioner had demonstrated neither presumed nor actual prejudice from pretrial publicity.  *Murray*, 184 Ariz. at 26, 906 P.2d at 559.  The court explained:

> For a court to presume prejudice, defendant must show "pretrial publicity so outrageous that it promises to turn the trial into a mockery of justice or a mere formality." *Bible,* 175 Ariz. at 563, 858 P.2d at 1166.  To reach a conclusion on presumed prejudice, we review the entire record, without regard to the answers given in voir dire.  *Id.* at 565, 858 P.2d at 1168.

> Defendants did not meet their burden of proof to show that "the publicity has been so extensive and so prejudicial as to create the probability that [they] will be denied a fair trial." *State v. Smith,* 116 Ariz. 387, 390, 569 P.2d 817, 820 (1977).  Defendants called a news reporter and investigator as witnesses before trial to attempt to show that pretrial publicity prejudiced defendants because various people in the community had formed opinions about their guilt or innocence.  However, they failed to show *what* pretrial publicity was so outrageous, resulting in a trial that was "utterly corrupted." *Murphy v. Florida,* 421 U.S. 794, 798, 95 S.Ct. 2031, 2035, 44 L.Ed.2d 589 (1975).

*Id.* (emphasis in original).  The court found that Petitioner failed to show actual prejudice because only those prospective jurors who indicated they could set aside the publicity and decide the case on the evidence presented remained on the jury panel, and the jury was warned repeatedly to avoid media coverage of the trial.  *Id.*

## B.    Analysis

Petitioner contends that the Arizona Supreme Court applied the wrong legal standard in evaluating "presumed prejudice" and made an unreasonable determination of the facts regarding the effect of pretrial publicity on the jury pool.  Dkt. 111 at 10-11.  The Court does not agree.

A criminal defendant is entitled to a fair trial by "a panel of impartial, 'indifferent'

jurors." *Irvin v. Dowd,* 366 U.S. 717, 722 (1961). "[I]f pretrial publicity makes it impossible to seat an impartial jury, then the trial judge must grant the defendant's motion for a change of venue." *Casey*, 386 F.3d at 906 (citing *Harris v. Pulley*, 885 F.2d 1354, 1361 (9th Cir. 1988)).

The Supreme Court has discussed two types of prejudice resulting from pretrial publicity: presumed prejudice, where the setting of the trial is inherently prejudicial, and actual prejudice, where voir dire is inadequate to offset extensive and biased media coverage. *See Murphy v. Florida*, 421 U.S. 794, 798 (1975). Petitioner contends only that presumed prejudice existed in this case.

A court presumes prejudice only in the face of a "trial atmosphere utterly corrupted by press coverage," *Dobbert v. Florida,* 432 U.S. 282, 303 (1977), or a "wave of public passion that would make a fair trial unlikely by the jury," *Patton v. Yount,* 467 U.S. 1025, 1040 (1984). The presumption of prejudice is "rarely applicable and is reserved for an 'extreme situation.'" *Harris,* 885 F.2d at 1361 (internal citations omitted). The Supreme Court has found presumed prejudice in only three cases: *Rideau v. Louisiana*, 373 U.S. 723 (1963); *Estes v. Texas*, 381 U.S. 532, 536 (1965); and *Sheppard v. Maxwell*, 384 U.S. 333 (1966).

While Petitioner's case generated substantial media interest, the nature of the coverage is distinguishable from the publicity present in cases where prejudice has been presumed. Most significantly, the media coverage of Petitioner's case was neither as pervasive nor as inflammatory as in cases where the Supreme Court found presumptive prejudice, including *Rideau* and *Sheppard*, where the Court overturned state-court convictions because the trial atmosphere had been "utterly corrupted" by the media.[6]

---

[6] In the third case, *Estes*, the Court found presumptive prejudice based on the trial's carnival-like atmosphere. A pretrial hearing was televised live and then replayed, with the broadcasts reaching 100,000 viewers. *Estes*, 381 U.S. at 550. During the hearing, "the

*Murphy*, 421 U.S. at 798.

In *Rideau*, the defendant's detailed twenty-minute confession was broadcast on television three times. 373 U.S. at 724. In a community of 150,000, nearly 100,000 people saw or heard the broadcast. *Id.* "What the people of Calcasieu Parish saw on their television sets was Rideau, in jail, flanked by the sheriff and two state troopers, admitting in detail the commission of the robbery, kidnapping, and murder, in response to leading questions by the sheriff." *Id.* at 725. As the Supreme Court explained, the televised confession "*was* Rideau's trial," and "[a]ny subsequent court proceedings in a community so pervasively exposed to such a spectacle could be but a hollow formality." *Id.* at 726 (emphasis added).

In *Sheppard*, "massive, pervasive and prejudicial publicity" prevented the defendant from receiving a fair trial. 384 U.S. at 335. Much of the publicity was not fact-based or objective, but sensational and openly hostile. For example, articles "stressed [Sheppard's] extra marital love affairs as a motive for the crimes," while editorials characterized him as a liar and demanded his arrest. *Id.* at 340 341. Other news stories described evidence that was never produced at trial. *Id.* at 340.

Most of the media coverage identified by Petitioner reported on the crime and the Murrays' arrest, indictment, and trial. Dkt. 111 at 12-15. Although some of the reports recounted evidence found with the Murrays or at the scene, and included law enforcement statements about the crime and how it was perpetrated, these reports appear to have been factual rather than inflammatory. *See Gallego v. McDaniel*, 124 F.3d 1065, 1071 (9th Cir.

---

courtroom was a mass of wires, television cameras, microphones and photographers. The petitioner, the panel of prospective jurors, who were sworn the second day, the witnesses, and the lawyers were all exposed to this untoward situation" *Id.* at 550-51. The Supreme Court found that such media intrusion was inherently prejudicial due to its effect on the witnesses, the judge, the defendant, and, most significantly, on the "televised jurors." *Id.* at 545. Such intrusive courtroom coverage is not an issue in Petitioner's case.

1997) (factual accounts of pretrial events did not constitute "prejudicial and inflammatory" news coverage requiring a change of venue).  Petitioner asserts that two Kingman newspaper stories and some radio stations reported that the Murrays were wanted for the beating death of a 76 year old woman in Alabama and were suspects in a cross-country crime spree.  Dkt. 111 at 12-15.  These press reports, while clearly warranting careful voir dire and jury selection, do not rise to the level of the repeatedly-televised confession in *Rideau* or the "massive, pervasive and prejudicial publicity" in *Shephard*.  384 U.S. at 335.

Petitioner provides statistics regarding the population of the Kingman area and the relative infrequency of murders there.  Dkt. 111 at 12-13.  Petitioner also notes that news reports appeared immediately after the murders and continued for some time.  *Id*. at 12-15.  The Court's review of this evidence suggests, however, that the media coverage was largely factual and consistent with what would be expected for a crime such as this.  As noted above, such press coverage clearly would require careful jury selection, but it was not so extensive and inflammatory that the trial court must have presumed the jury would be prejudiced.  As the Ninth Circuit has explained, "'[p]rejudice is presumed when the record demonstrates that the community where the trial was held was saturated with prejudicial and inflammatory media publicity about the crime. Prejudice is rarely presumed because 'saturation' defines conditions found only in extreme situations.'" *Ainsworth v. Calderon,* 138 F.3d 787, 795 (9th Cir. 1998), *as amended*, 152 F.3d 1223 (9th Cir. 1998) (quoting *United States v. Sherwood*, 98 F.3d 402, 410 (9th Cir. 1996).  This was not an extreme situation.  Based on the quantity and quality of the media coverage, the Court concludes that Petitioner's trial was not one of those rare cases where pretrial publicity rendered the trial a "hollow formality." *Rideau*, 373 U.S. at 726.

The Court also rejects Petitioner's contention that the Arizona Supreme Court employed an "artificially high standard" when assessing presumed prejudice.  Dkt. 111 at 10, 17.  The court correctly cited United States Supreme Court precedent, *Murphy*, 421 U.S.

at 798, for the proposition that prejudice from pretrial publicity may be presumed where the media coverage was so outrageous that the trial was "utterly corrupted." *Murray*, 184 Ariz. at 26, 906 P.2d at 559.  The court also cited its own holdings in *State v. Bible*, 175 Ariz. 549, 858 P.2d 1152 (1993), and *State v. Smith*, 116 Ariz. 387, 569 P.2d 817 (1977).  *Id*.  *Bible* and *Smith*, in turn, relied on *Murphy*, *Rideau*, *Sheppard*, *Estes*, and other Supreme Court precedent for their analysis of presumed prejudice.  *Bible*, 175 Ariz. at 564, 566, 858 P.2d at 1167, 1169; *Smith*, 116 Ariz. at 390, 569 P.2d at 820.  The Arizona Supreme Court applied the correct standard in analyzing the issue of presumed prejudice, evaluating whether the pretrial publicity was of such a nature that Petitioner could not have received a fair trial.  *Murray*, 184 Ariz. at 26, 906 P.2d at 559.

Finally, Petitioner contends that the Arizona Supreme Court reached an unreasonable factual determination when it found that Petitioner "failed to show what pretrial publicity was so outrageous," *Murray*, 184 Ariz. at 26, 906 P.2d at 559, despite the articles and testimony offered by the defense at the pretrial hearing.  Dkt. 111 at 11.  The court did not, as Petitioner asserts, ignore the evidence of pretrial publicity.  Rather, it reasonably determined that the evidence presented by Petitioner did not show that the publicity was so extensive and inflammatory that prejudice could be presumed.

The Arizona Supreme Court did not unreasonably apply clearly established federal law in rejecting Petitioner's claim of presumed prejudice, nor was its decision based on an unreasonable determination of the facts.  Petitioner is not entitled to relief on Claim 1.

## II.   Claim 3

Petitioner alleges that he was denied his Sixth and Fourteenth Amendment rights to proceed *pro per* with the assistance of advisory counsel.  Dkt. 111 at 18-25.

### A.   Background

Petitioner was represented by court-appointed attorney Ruth O'Neill, a former Mohave County public defender who had moved into private practice.  RT 3/25/98 at 5.  She

relocated to Tucson, more than 300 miles from Kingman, after her appointment to Petitioner's case. *Id.* at 6.

On January 2, 1992, Petitioner filed a "Motion to Proceed in Proper Person, and Appointment of Co-Counsel and Investigator." Citing delays in the case and difficulties caused by the relocation of his appointed counsel, Petitioner stated that he "feels compelled to take charge, and exercise his right to represent himself." ROA 54 at 2. He also requested the appointment of "an attorney from the legal defender's office, to act as co-counsel in assisting him in the preparation and deposition" of the case. *Id.* at 3. Petitioner explained that he "does realize the responsibility of representing himself, and believes that along with the appointed co-counsel and investigator, that he can prepair [sic] and deliver, the defence into superior court, just as good as, if not better than any defence counsel that, the state of Arizona had to offer." *Id.*

Petitioner further explained his position at a hearing on the motion:

> Your Honor, I feel that due to the – it's been eight months since this thing's started, and it's been dragging around in my opinion. I don't ask the court to proceed by myself as pro per, but as primary counsel, a co-counsel appointed from the legal defender's office to assist me in this thing, you know. Just seems like it would, that if I was governing the things and make – had more control, that it might be, in my opinion, better off for myself to have more control in the case than what I have now.

RT 1/14/92 at 3-4. The prosecutor did not take a position on whether Petitioner should be permitted to represent himself, but argued that hybrid representation was not allowed under Arizona law. *Id.* at 4-5. He also asserted that Petitioner was a flight risk and should not be allowed access to the law library to conduct legal research.[7] *Id.* at 5.

The court then addressed Petitioner:

> You are entitled to represent yourself if that's what you choose, and, of course, if the Court finds that you're competent to represent yourself. . . . But, you are not entitled to have a co-counsel. The Court, if you decide to

---

[7] Corrections officers had intercepted a coded letter from Petitioner to his brother in which Petitioner indicated that he was going to attempt to break out of jail. ROA 382.

represent yourself, will probably appoint you an advisory counsel.  I also agree with the State's comments that you would not be allowed out of jail to do any sort of research.  Your advisory counsel would be able to do that research for you.  In other words, you can either represent yourself and have an advisory counsel to do research for you and give you advice on particular matters, or you can have an appointed attorney.  So really, those are the choices.  You are not entitled in Arizona or anywhere else that I am familiar with, to have both, to represent yourself and have co-counsel working with you.

*Id.* at 5-6.  The judge indicated that he was "interested in getting this case moving along, too."  *Id.* at 6.  He then asked Petitioner, "what your position is on whether you want to represent yourself, or if you are willing to stay with the attorney that you have got, or if you want another attorney."  *Id.*  Petitioner responded: "Under those terms, I would attempt to be satisfied with another attorney appointed from the legal defender's office."  *Id.* at 7.

When Petitioner indicated to the court that he had not yet discussed with Ms. O'Neill the possible consequences of the appointment of substitute counsel from the legal defender's office, the court sought input from the head of that office, Ms. Leftwich, who was present at the hearing.  *Id.*  She indicated that she was willing to accept the case, but explained that she would need additional time to prepare for trial due to the office's heavy caseload.  *Id.* at 7-9.  The court then continued the hearing and directed Petitioner to discuss the matter with both Ms. O'Neill and Ms. Leftwich.  *Id.* at 9.  Petitioner stated that he did not object to that procedure.  *Id.* at 9-10.

When the hearing resumed, Ms. O'Neill addressed the court.  *Id.* at 17-19.  She proposed, as a response to Petitioner's concerns about her relocation to Tucson, the appointment of Ms. Leftwich as "local counsel" to facilitate communication between Petitioner and Ms. O'Neill and to handle "anything that may come up that requires immediate action," while Ms. O'Neill remained counsel of record.  *Id.* at 19.  The court asked Petitioner if he had any comments concerning Ms. O'Neill's presentation, and Petitioner responded, "Well, I agree with everything that Ms. O'Neill said."  *Id.*  The court then ordered "that the legal defender's office act as local counsel and assist Ms. O'Neill in

the representation of [Petitioner]." *Id.*

On direct appeal, the Arizona Supreme Court denied Petitioner's claim that his right to represent himself was violated by the trial court's denial of his motion to proceed pro per with appointed co-counsel. *Murray*, 184 Ariz. at 27, 906 P.2d at 560. The court first explained that hybrid representation – "the concurrent or alternate representation by both defendant and counsel" – is permissible in the trial court's discretion, but not constitutionally mandated. *Id.* The court found that circumstances did not support the appointment of substitute counsel, explained that Petitioner voluntarily agreed to the arrangement proposed by the trial court, and held that the "[t]he trial judge did not abuse his discretion by denying hybrid representation." *Id.*

B.   Analysis

Petitioner contends that the supreme court's denial of this claim represented both an unreasonable application of clearly established federal law and an unreasonable determination of the facts. The Court disagrees.

Under the Sixth Amendment, criminal defendants have a right to be represented by an attorney. The right to counsel has been interpreted to encompass "an independent constitutional right" of the accused to represent himself at trial, and thus waive the right to counsel. *Faretta v. California*, 422 U.S. 806, 834-35 (1975). Such waiver must be "knowing, voluntary, and intelligent." *Iowa v. Tovar,* 541 U.S. 77, 88 (2004); *Faretta,* 422 U.S. at 835. It must also be unequivocal. *See Stenson v. Lambert*, 504 F.3d 873, 882 (9th Cir. 2007); *United States v. Robinson*, 913 F.2d 712, 714 (9th Cir. 1990).

Petitioner's request to represent himself was far from unequivocal. Petitioner contends that his motion was a straightforward request to waive counsel and proceed pro per, and criticizes the trial court for its "hyper-technical interpretation" of the motion and for failing to explain the difference between co-counsel and advisory counsel. Dkt. 111 at 21-22. This criticism is not well-taken. The written motion to proceed pro per was

ambiguous at best, and Petitioner added to the confusion by his statements at the hearing when he indicated that he was not asking to proceed pro per, but rather wished to act as lead counsel with appointed co-counsel.  RT 1/14/92 at 3-4.  The trial court's comments responded directly to the issues Petitioner presented, with the court explaining Petitioner's available options.  RT 1/14/92 at 5.  After being informed of his options and the consequences of self-representation, and discussing the matter with Ms. O'Neill and Ms. Leftwich, Petitioner chose to be represented by counsel.  There is nothing in the record indicating that Petitioner was coerced or forced into making this decision, and thereafter Petitioner never requested a change of counsel or self-representation.

To the extent Petitioner made a request to waive counsel and represent himself, the request was equivocal.  Petitioner complained about his current lawyer and delays in the proceedings; he also asked for co-counsel and for a new lawyer to be appointed.  Addressing a similar scenario, the Ninth Circuit in *Stenson* rejected the petitioner's *Faretta* claim, holding that the state court did not unreasonably find that his request to proceed pro se was not unequivocal.  504 F.3d at 883.  There, the petitioner stated several times that he really did not want to represent himself, but that he felt the court and his existing counsel were forcing him to do so; he did not include a request to represent himself in his final motion for new counsel; and he requested that a specific attorney be retained as counsel.  *Id.* at 883-84.  The Ninth Circuit found that these facts supported the inference that the petitioner preferred working with an attorney over representing himself.  *Id.; see also Cross v. United States*, 893 F.2d 1287, 1291-92 (11th Cir. 1990) (although defendant's initial statement to court that he wanted to be allowed to represent himself "through this whole trial" was clear and unambiguous, his subsequent clarification established that he had no intention of waiving his right to counsel, but merely was seeking permission to act as co-counsel; therefore refusal to grant request did not violate *Faretta*).  The Court finds that Petitioner in this case, like the petitioner in *Stenson*, did not clearly and unequivocally express a desire to waive

counsel and represent himself.  The Arizona Supreme Court's rejection of this claim was neither contrary to nor an unreasonable application of clearly established federal law, nor was it based on an unreasonable determination of the facts.

**III.   Claim 7**

Petitioner alleges that the trial court improperly denied his *Batson* motion in violation of his rights under the Fourteenth Amendment.  Dkt. 111 at 26-34.

A.   <u>Background</u>

In exercising its peremptory strikes, the State removed the only remaining Hispanic members of the jury panel, Christina Pethers and David Alvarado.[8]  Defense counsel objected pursuant to *Batson v. Kentucky,* 476 U.S. 79 (1986).  RT 5/29/92, Vol. II, at 20. The trial court then required the prosecutor to articulate his reason for the strikes.  The prosecutor first indicated that he was not aware that Ms. Pethers was Hispanic, although her maiden name was Garcia.  *Id.* at 21.  He then informed the court:

> [T]he State recently did a major drug investigation of her mother and her mother's brother, Eddie Mallon.  It's a very big case.  Both of those defendants went to jail for a time.  I'm not sure of the status of Mrs. Garcia. From what Mrs. Pethers said, the charge was dismissed.  I believe there's been some sort of negotiated deal, but I am not positive about that.  But, I know both of those people were heavy into drugs.  Both of those people were suspected of being in drugs.  There's a forfeiture action proceeding against Garcia, Mallon.  This being the daughter, I do not believe that she – I don't want her on the jury for those reasons, possible bias.

*Id.* at 21-22.[9]

With respect to Mr. Alvarado, the prosecutor explained:

---

[8] A third Hispanic juror was removed for cause because he was the trial judge's uncle. RT 5/28/92 at 20, 105.

[9] During her individual voir dire, Pethers had indicated that she was familiar with the County Attorney, Bob Moon, through her mother's case, which Moon had prosecuted; according to Pethers, the case had been dismissed and did not go to trial.  RT 5/29/92, Vol. I, at 80.  When asked if anything about the prosecution of her mother would affect he ability to sit on the case, Pethers replied, "No."  *Id.* at 80-81.

> Mr. Alvarado is Hispanic, and it was a close call on that strike. What I went on is, as Mr. Alvarado told the court, he knows me, I know him. Not well. I'm going basically on my personal knowledge of Mr. Alvarado five or six years ago. . . . I met Mr. Alvarado at social functions, parties, whatnot. I met Mr. Alvarado probably half a dozen times anyway, and had discussions with him. . . . [M]y recollection of Mr. Alvarado is he's a very, very nice person. He is too nice. You couldn't get him to disagree with you. He didn't want to hurt anybody. He is just indecisive, is my recollection of him. My strike on him is solely going back to my personal knowledge of meeting him numerous times four or six years ago.

*Id.* at 22.   Based on the prosecutor's explanations, the court denied Petitioner's *Batson* motion:

> Well, under *Batson*, of course, the real question is whether the State gives valid race neutral reasons for the strike, and based on the record, my own opinions about those particular jurors, I find that the reasons given by the State are sufficient.   It's difficult to make a *Batson* case when you only have two minorities on the jury, but even with the two I am finding that the reasons are sufficient.   I don't find that there was any racial reasons for the strikes, and the reasons given are consistent with my own assessments of those particular jurors.

*Id.* at 22-23.

On direct review, the Arizona Supreme Court held that the potential bias of Ms. Pethers based on the State's criminal investigation of her relatives was "a sufficient reason to peremptorily challenge a juror."   *Murray*, 184 Ariz. at 25, 906 P.2d at 558.   With respect to the strike of Mr. Alvarado, the court held that no *Batson* violation occurred "[b]ecause the prosecutor's explanation was based on prior contact with the venire member outside the jury setting, his determination was not 'wholly subjective,'" and because "the trial court's own observations provided . . . objective verification."   *Id.*   The supreme court "accept[ed] the prosecutor's reasons as race neutral."   *Id.*

B.      Analysis

In *Batson*, the United States Supreme Court held that the Equal Protection Clause forbids a prosecutor from challenging potential jurors solely on account of their race.   476 U.S. at 89.   Hispanics are a cognizable racial group for *Batson* purposes, *Fernandez v. Roe*, 286 F.3d 1073, 1077 (9th Cir. 2002) (citing *Powers*, 499 U.S. at 409-16), and the *Batson*

- 21 -

principle applies where, as here, the criminal defendant and the excluded jurors are of different races, *Powers v. Ohio*, 499 U.S. 400, 409 (1991).

Under *Batson*, a defendant's challenge to a peremptory strike requires a three-step analysis. First, the trial court must determine whether the defendant has made a prima facie showing that the prosecutor exercised a peremptory strike on the basis of race. *See Rice v. Collins,* 546 U.S. 333, 338 (2006). If the showing is made, the burden shifts to the prosecutor to present a race-neutral explanation for the strike. *Id.* The trial court then must determine whether the defendant has carried his burden of proving purposeful discrimination. *Id.*

With respect to *Batson*'s second step, while the prosecutor must offer a "comprehensible reason" for the strike, *id.*, the reason need not be "persuasive, or even plausible," *Purkett v. Elem,* 514 U.S. 765, 768 (1995) (per curiam). "So long as the reason is not inherently discriminatory, it suffices." *Rice*, 546 U.S. at 338; *see Hernandez v. New York*, 500 U.S. 352, 360 (1991) (plurality opinion) ("Unless a discriminatory intent is inherent in the prosecutor's explanation, the reason offered will be deemed race neutral.").

Under the third *Batson* step, after the prosecution puts forward a race-neutral reason, the court is required to evaluate the persuasiveness of the justification to determine whether the prosecutor engaged in intentional discrimination. *Purkett*, 514 U.S. at 768. The court need not agree with the prosecutor's stated nonracial reason – the question is not whether the reason represents a sound strategic judgment, but whether counsel's race-neutral explanation for a peremptory challenge should be believed. *Hernandez*, 500 U.S. at 365. "[I]mplausible or fantastic justifications may (and probably will) be found to be pretexts for purposeful discrimination." *Purkett*, 514 U.S. at 768. "In deciding if the defendant has carried his burden of persuasion, a court must undertake a sensitive inquiry into such circumstantial and direct evidence of intent as may be available." *Batson*, 476 U.S. at 93 (internal quotations omitted). Both the Supreme Court and the Ninth Circuit have utilized

comparative juror analysis to assess whether a prosecutor's race-neutral explanation for a strike was in fact a pretext for a discriminatory strike. *Miller-El II*, 545 U.S. at 241 ("If a prosecutor's proffered reason for striking a black panelist applies just as well to an otherwise-similar nonblack who is permitted to serve, that is evidence tending to prove purposeful discrimination at *Batson*'s third step."); *see Boyd v. Newland*, 467 F.3d 1139 (9th Cir. 2006); *Kesser v. Cambra*, 465 F.3d 351 (9th Cir. 2006).

Upon habeas review, a petitioner is entitled to relief on a *Batson* claim only if the state court's denial of the claim constituted "an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2); *see Rice*, 546 U.S. at 338. Thus, this Court can grant relief only "if it was unreasonable to credit the prosecutor's race-neutral explanations for the *Batson* challenge." *Id.* In addition, under § 2254(e)(1), "[s]tate-court factual findings . . . are presumed correct; the petitioner has the burden of rebutting the presumption by 'clear and convincing evidence.'" *Id.* at 338-39. Therefore, although "[r]easonable minds reviewing the record might disagree about the prosecutor's credibility, . . . on habeas review that does not suffice to supersede the trial court's credibility determination." *Id.* at 341-42.

The explanations offered by the prosecutor for striking Pethers and Alvarado were not inherently discriminatory and therefore were race-neutral under *Batson*. *Rice*, 546 U.S. at 338. The explanations were also juror-specific and supported by the record. *See Mitleider v. Hall*, 391 F.3d 1039, 1050 (9th Cir. 2004). They were not implausible or fantastic. *Purkett*, 514 U.S. at 768.

With respect to the strike of Pethers based on the criminal prosecutions of her close relatives, courts have held that a family member's criminal history constitutes a race-neutral factor for a peremptory challenge of a prospective juror. *See United States v. Vaccaro*, 816 F.2d 443, 457 (9th Cir.1987), *overruled on other grounds by Huddleston v. United States*, 485 U.S. 681 (1988) ("reasonable" to challenge black juror whose brother was in prison for

armed robbery); *United States v. Hendrix*, 509 F.3d 362, 371 (7th Cir. 2007) ("legitimate and race-neutral" for prosecutor to strike prospective African-American jurors who had relatives in prison); *Lamon v. Boatwright*, 467 F.3d 1097, 1102 (7th Cir. 2006) (no showing that the prosecutor's explanation for strike of African-American juror – that police report showed contacts at juror's address, that she had prosecuted other people with same last name as the juror, and that she the doubted juror's credibility because he failed to disclose that his relatives had criminal convictions – was a pretext for race discrimination); *Messiah v. Duncan*, 435 F.3d 186, 201 (2d Cir. 2006) (prosecutor could reasonably have believed that juror who had been prosecuted by his office and who had relatives in prison would be unduly sympathetic to defendant and hostile to the prosecutor); *United States v. Wiggins,* 104 F.3d 174, 176 (8th Cir. 1997) ("the incarceration of a close family member is a legitimate race-neutral reason justifying the use of a peremptory strike"); *United States v. Mathis,* 96 F.3d 1577, 1582 (11th Cir. 1996) ("The record shows that [the potential juror], who is Hispanic, was removed because a close family member of hers had had a cocaine conviction. There was no clear error in allowing the strike.").

The prosecutor's explanation for striking Alvarado, based on first-hand knowledge of the juror's personality which led the prosecutor to believe that Alvarado was indecisive and easily led, was likewise race-neutral.  *See United States v. Velazquez-Rivera*, 366 F.3d 661, 666 (8th Cir. 2004) (proffered reasons for striking female Hispanic juror – that she was a nurse, was highly educated and therefore might dominate the jury, and appeared particularly kind and sympathetic – were nondiscriminatory and genuine); *Simmons v. Luebbers*, 299 F.3d 929, 941 (8th Cir. 2002) (state appellate court did not make unreasonable determination of fact in concluding that prosecutor's stated reasons for striking African-American juror, including because she was indecisive, were race-neutral and not violative of *Batson*).

Because the prosecutor satisfied the second step of *Batson* by providing race-neutral

reasons for striking the Hispanic jurors, the remaining issue is whether the state courts were unreasonable in crediting these explanations. *Rice*, 546 U.S. at 338. In support of his contention that the courts unreasonably applied *Batson*, Petitioner relies on *Miller-El* and *Kesser*.

The factual circumstances of the present case are much less drastic than those present in *Miller-El* and *Kesser*. In *Miller-El*, there was evidence of jury shuffling, which placed white jurors ahead of African-American jurors, and disparate questions regarding the ethnicity of the prospective juror. *Miller-El II*, 545 U.S. at 253-263. There was also evidence that a general policy existed by which African-Americans were not to be seated on juries. *Id.* at 253. These circumstances did not exist in Petitioner's case.

In *Kesser*, the prosecutor struck three prospective Native American jurors, describing one of them as "darker skinned" and stating that Native Americans who worked for the tribe were "a little more prone to associate themselves with the culture and beliefs of the tribe than they are with the mainstream system." 465 F.3d at 357. The prosecutor expressed his concern about the resistence of Native Americans to the criminal justice system and his belief that they may be more tolerant of child molestation because of their affiliation with the tribe. *Id.* The prosecutor struck the one remaining minority member of unknown heritage whom he described as "brown skinned." *Id.* Nothing comparable to these race-based actions was present in the prosecutor's explanations for his strikes of Pethers and Alvarado.

Petitioner also asserts that a comparative juror analysis supports his contention that the strikes were discriminatory and the prosecutor's explanations pretextual. Petitioner cites non-minority jurors who he claims were similarly situated to Pethers and Alvarado but were not stricken. A review of these jurors – Tina Bonsang, Warren Ellis, Charlotte Evans, and Everett Jenks – reveals they were not similarly situated to Pethers and Alvarado.

During jury selection, one of the defense attorneys informed the court that he

represented an individual with the last name Bonsang and requested the court to speak with panel member Tina Bonsang to determine whether there was any relation between the two. RT 9/28/92 at 46. Bonsang informed the court that her brother-in-law was the individual represented by defense counsel and that she was aware that he had "gotten a few DUI's lately." *Id*. at 47. She also informed the court that the fact that her brother-in-law had been prosecuted for DUIs would not affect her ability to sit on the jury. *Id*.

Bonsang's situation is distinguishable from Pethers's. In striking Pethers, the prosecutor reasoned that Pethers would likely exhibit more bias because her mother and uncle were being prosecuted pursuant to a major drug investigation. RT 9/29/92, Vol. II, at 21-22. Unlike Bonsang, Pethers revealed that she was familiar with the prosecutor in charge of her mother's prosecution. In addition to the criminal action against Pethers's mother, there was also a civil forfeiture action. RT 5/29/92, Vol. I, at 80. Based on this race-neutral information, the prosecutor reasonably concluded that Pethers was more likely to harbor bias against the State than Bonsang.

These reasons apply equally with regard to Ellis. Ellis indicated that his son-in-law had been charged with possession of drugs. RT 9/29/92, Vol. I, at 29. He stated that this fact would not affect his "thinking on the criminal justice system." *Id*. Ellis did not indicate how familiar he was with his son-in-law's case or whether he knew the prosecutor. *Id.* He did, however, share his opinion that his son-in-law "got off too easy" (*id.* at 30), a comment which may have suggested to the prosecutor that Ellis did not hold a bias against the government for its prosecution of his relative. Again, this scenario is distinct from that involving Pethers. While there was no information that Ellis's son-in-law was charged by the prosecutor's office, Pethers's mother was charged by that office, and it was evident from the record she was familiar with her mother's case and the prosecuting office.

Prospective juror Charlette Evans indicated she knew the prosecutor because she and her children delivered his morning paper and they talked on occasion. RT 5/28/92 at 28.

Juror Everett Jenks knew the prosecutor because they were lodge brothers. *Id.* at 17. According to Petitioner, "[p]resumably, [the prosecutor] felt these other two social acquaintances were 'nice' people, and yet he did not use his peremptory strikes against them. . . . [The prosecutor's] opposition to striking a Caucasian social acquaintance undercuts the veracity of his purported reason for striking Alvarado."[10]   Dkt. 111 at 33. Petitioner's argument does not address the fact that the prosecutor struck Alavardo not because they were acquainted or because Alvarado was friendly, but because he believed Alvarado's indecisiveness would make him an ineffective juror.  There is no evidence that the prosecutor had formed a similar conclusion about the personalities of either Evans or Jenks.  The Court concludes that the differences between Pethers and Alvarado and the white jurors are substantial enough to render insignificant the results of the comparative juror analysis performed by Petitioner. *See United States v. Valley*, 928 F.2d 130, 136 (5th Cir. 1991) (explanation for striking black jurors – family member's criminal history – was not pretextual even though it applied to white jurors who were not struck, because there were "race-neutral differences" between the jurors); *United States v. Lance,* 853 F.2d 1177, 1181 (5th Cir. 1988) ("Although the prosecutor may have accepted a white juror with some characteristics similar to the black persons he rejected, the prosecutor also gave reasons for his selection that we are unable to evaluate").

   C.   Conclusion

   The prosecutor offered race-neutral explanations for striking Pethers and Alvarado. The burden thereafter shifted to Petitioner to prove that those reasons were pretextual and the strikes discriminatory.  Applying *Batson*, the trial court and the Arizona Supreme Court accepted the prosecutor's race-neutral explanations and concluded that Petitioner had failed to meet his burden of proving discriminatory intent.  On habeas review, "[a] state court's

---

   [10] The court excused Jenks for cause after he indicated that he would have difficulty sitting on the jury because he and victim Dean Morrison had been friends.  RT 5/28/92 at 78.

finding of the absence of discriminatory intent is a 'pure issue of fact' accorded significant deference." *Miller-El I*, 537 U.S. at 339 (explaining that the trial judge can measure the credibility of a prosecutor's race-neutral explanations by reference to several factors, including its personal observations of the juror and of "the prosecutor's demeanor; by how reasonable, or how improbable the explanations are; and by whether the proffered rationale has some basis in accepted trial strategy"). Petitioner has not rebutted this presumption with clear and convincing evidence.

Because the state court decision was not an unreasonable application of *Batson*, and because it was not based on an unreasonable determination of the facts in light of the evidence presented, Petitioner is not entitled to relief on Claim 7.

## IV.    Claim 10

Petitioner alleges that the trial court improperly precluded impeachment of Detective Lent in violation of Petitioner's rights under the Fourteenth Amendment. Dkt. 111 at 34-40.

### A.    Background

Detective Lent testified about gunshot wounds to the victims and about tracks at the murder scene that linked Petitioner and his brother to the murder and revealed some of the events that occurred during the crime. On cross-examination, counsel for co-defendant Roger Murray asked Detective Lent, "In at least one case you admitted that you lied under oath?" RT 6/2/92, Vol. I, at 3. Detective Lent responded, "Correct." *Id.* The State objected, and the court took a recess to consider the matter. *Id.*

As an offer of proof, defense counsel indicated that in a prior case, *State v. Geary*, a Mohave County case from 1986, Detective Lent admitted that he had fabricated and concealed evidence. *Id.* at 4. Counsel had a transcript of Lent's testimony in that matter, and was prepared to call a witness who was present at the previous trial. *Id.* at 6. After reviewing the transcript, the court declined to admit the extrinsic evidence:

. . . I don't think this is something you can use. This – if I allow you to ask those two questions [i.e., whether Lent concealed and fabricated evidence] with this transcript, then I am going to have to open up this whole thing, and it's not extremely probative of the matters before this Court. I think it is extremely confusing and will be – I just don't think it is something that I am going to allow you to use, because I think its probative value does not outweigh its unfair prejudice or its confusing aspects. If I allow you to ask those questions, then I am going to have to admit the whole transcripts and retry the Don Geary case, and I am not inclined to do that. . . . I am not going to allow you to ask those questions.

*Id.* at 13-14. The court subsequently instructed the jury: "before we took that recess there were some questions asked. They were objected to. I sustained the objection. That means you are to disregard the questions that were asked and not consider any answer which may or may not have been given." *Id.* at 21.

On direct appeal, the Arizona Supreme Court held that the trial court's ruling did not entitle Petitioner to relief:

This question is governed by Rule 608(b), Arizona Rules of Evidence, which covers impeachment of witnesses using evidence of specific instances of conduct. The rule has three requirements: (1) the conduct may not be proved by extrinsic evidence, (2) the conduct must be probative of the character of the witness for truthfulness, and (3) the trial court must exercise discretion to determine whether the probative value of the conduct is substantially outweighed by the danger of unfair prejudice, confusion, or waste of time. *State v. Lee,* 151 Ariz. 428, 430, 728 P.2d 298, 300 (App.1986). The trial court's determination is analyzed on an abuse of discretion standard. *See State v. Woods,* 141 Ariz. 446, 453, 687 P.2d 1201, 1208 (1984).

This court dealt with a similar issue involving Detective Lent in *State v. Hill,* 174 Ariz. 313, 326, 848 P.2d 1375, 1388, *cert. denied,* 510 U.S. 898, 114 S.Ct. 268, 126 L.Ed.2d 219 (1993), concluding that the trial court properly refused to allow impeachment by using a transcript from another proceeding.

The trial court here considered the arguments made by counsel in chambers and apparently concluded that Lent's admissions were not probative of truthfulness in that Lent never intentionally misled anyone, though he admitted to being mistaken as to things that occurred two years before. . . . There was no abuse of discretion.

*Murray*, 184 Ariz. at 30-31, 906 P.2d at 563-64 (footnote omitted).

1

B.     Analysis

2       Petitioner repeatedly describes the extrinsic impeachment evidence against Detective

3  Lent as revealing "admitted perjury." Dkt. 111 at 39, 40. This characterization is not

4  entirely accurate. As the Arizona Supreme Court noted (*Murray*, 184 Ariz. at 31, 906 P.2d

5  at 564), the transcript of Detective Lent's 1986 testimony in the *Geary* matter indicates that

6  he did not admit committing perjury or concealing or fabricating evidence, only that aspects

7  of his previous testimony in that case were "mistaken" and that a statement he made in an

8  interview from 1984 with the defendant's attorney (concerning whether Lent's diary

9  contained facts or only personal opinions) was not true.[11] Dkt. 111, Ex. 16 at 12, 19.

10  Petitioner likewise mischaracterizes the ruling of the trial court as barring "*any* questions

11  of impeachment" and "exclu[ding] all impeachment evidence" (Dkt. 111 at 38, 40), when

12  in fact the court ruled only that Petitioner could not impeach Detective Lent with respect to

13  the *Geary* case. RT 6/2/92, Vol. I, at 13-14. From this characterization of the trial court's

14  ruling follows Petitioner's assertion that the holding of the Arizona Supreme Court is not

15  entitled to deference because the court evaluated Petitioner's claim only with respect to Rule

16  608(b) and its prohibition on the use of extrinsic evidence for impeachment purposes and

17  did not address the trial court's alleged ban on all impeachment of Detective Lent. *See* Dkt.

18  117 at 24-32. Given this background, together with the applicable standards for habeas

19  relief, Claim 10 lacks merit.

20       As the parties acknowledge, state law matters, including a trial court's evidentiary

21  rulings, are generally not proper grounds for habeas corpus relief. "[I]t is not the province

22  of a federal habeas court to reexamine state-court determinations on state-law questions.

23  In conducting habeas review, a federal court is limited to deciding whether a conviction

24

25       [11] The Court has reviewed that transcript and the remaining attachments to Petitioner's
26  merits brief. The Court undertook this review notwithstanding its determination, set forth
  below, that Petitioner was not diligent in state court in developing the factual bases of his
27  habeas claims.

1    violated the Constitution, laws, or treaties of the United States." *Estelle v. McGuire,* 502

2    U.S. 62, 67-68 (1991) (internal quotation omitted); *see Jammal v. Van de Kamp*, 926 F.2d

3    918, 919 (9th Cir. 1991).  Only if the admission or exclusion of evidence was so prejudicial

4    as to offend due process may the federal courts consider it.  *Id.*

5        As an initial matter, it is far from apparent that the trial court erred in its application

6    Arizona Rule of Evidence 608(b).  The court did not prohibit all impeachment of Detective

7    Lent, but only impeachment based on the *Geary* case.  RT 6/2/92, Vol. I, at 13-14.  With

8    respect to that specific, collateral matter, the court determined that the probative value of the

9    evidence did not outweigh the unfair prejudice and confusion that would ensue if the

10   evidence were admitted.  RT 6/2/92, Vol. I, at 13-14.  The Court cannot say that this ruling

11   was incorrect.  A reading of the *Geary* transcript shows that Detective Lent did not admit

12   intentional perjury, but did admit mistaken and inaccurate testimony.  Dkt. 111, Ex. 16 at

13   12, 19.  Such an admission, although relevant, was not so probative as to not be outweighed

14   by the potential for prejudice and confusion.  The *Geary* transcript is not readily understood

15   on a single reading.  The transcript itself concerns several collateral matters – a report, a

16   diary, a statement by a judge, a statement by Detective Lent to a defense attorney, and the

17   facts of an alleged abuse case.  Significant presentation of the *Geary* matter would have

18   been required for the prosecution in Petitioner's case to respond to the suggestion that

19   Detective Lent had admitted to perjury in *Geary*.  As the trial court found, such a

20   presentation could have resulted in confusion and unfair prejudice.

21       But even if the trial court misapplied the Arizona rules of evidence, there is no clearly

22   established Supreme Court precedent holding that a state violates due process by prohibiting

23   impeachment through the use of extrinsic evidence.  In *Davis v. Alaska,* 415 U.S. 308, 316

24   (1974), the Supreme Court established that the Sixth Amendment requires the admission of

25   evidence concerning juvenile offenses that helps elucidate the "witness' motivation in

26   testifying." *Davis* was reaffirmed in *Delaware v. Van Arsdall,* 475 U.S. 673, 678-79 (1986).

27

Petitioner's case, however, involves not impeachment with specific evidence of bias, but the general use of extrinsic evidence to impeach a witness's credibility.  In *Yancey v. Gilmore*, 113 F.3d 104, 108 (7th Cir. 1997), the Seventh Circuit held that a habeas petitioner convicted of first-degree murder did not make the required showing that the trial court violated clearly established federal law by refusing to allow impeachment of witnesses through admission of evidence that they had juvenile records.  The court explained that Supreme Court jurisprudence allowed introduction of criminal history only to show the specific bias of a witness, and there was no bias claim in the petitioner's case.  *Id.*  The court further noted that, "although the Supreme Court has frequently held that states must permit cross-examination that will undermine a witness's testimony, it has never held – or even suggested – that the longstanding rules restricting the use of specific instances and extrinsic evidence to impeach a witness's credibility pose constitutional problems."  *Id.* (quoting *Hogan v. Hanks*, 97 F.3d 189, 191 (7th Cir. 1996)).

Similarly, in *Ellsworth v. Warden*, 333 F.3d 1, 8 (1st Cir. 2003) (en banc), the First Circuit determined that the trial court did not violate the Confrontation Clause by refusing to allow the defendant, who was charged with sexual abuse, to offer testimony concerning victim's lies about toy stealing or peeping at a different time and location from the alleged sexual abuse by defendant.  The court explained that under the AEDPA, "we can only reverse if the state court decision was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court."  *Id.*  The court added:

> Quite apart from the higher standard, there is nothing unusual about limiting extrinsic evidence of lies told by a witness on other occasions; under the Federal Rules of Evidence, exclusion of such evidence is the usual rule and even cross-examination as to such lies is limited.  The theory, simple enough, is that evidence about lies not directly relevant to the episode at hand could carry courts into an endless parade of distracting, time-consuming inquiries.  In this instance, a lie about toy stealing or peeping at a different time and location from the alleged sexual abuse by Ellsworth is classic "collateral" evidence regularly excluded in federal criminal trials.  *See*

- 32 -

Fed.R.Evid. 608(b).

*Id.*  The same concerns about retrying a collateral matter clearly motivated the trial judge when he precluded use of the *Geary* case to impeach Detective Lent.  RT 6/2/92, Vol. I, at 13-14.[12]

Moreover, Petitioner has not shown that he was prejudiced by the exclusion of impeachment evidence regarding Detective Lent's actions in *Geary*.   Petitioner's questioning about this collateral matter would have shown that Detective Lent made mistakes in his investigations and testimony during a previous case.  Such an attack would not necessarily have implicated Detective Lent's expertise in the area of tracking, a topic which was the subject of extensive and vigorous cross-examination.  *See Bright v. Shimoda*, 819 F.2d 227, 229 (9th Cir.1987) (federal habeas court will rarely find a constitutional violation if the defendant was allowed to cross examine a witness at length and was restricted solely on a collateral matter).

More importantly, Petitioner's presence at the crime scene and his involvement in the murders would have been established by overwhelming evidence even if Detective Lent's testimony had been discounted entirely.  As the Arizona Supreme Court explained:

> An atlas with Grasshopper Junction circled was found in [Petitioner's] Ford Tempo.  Defendants had spent the night of May 12 in Kingman and had

---

[12] Petitioner insists that he could have impeached Detective Lent "through cross-examination alone," without the use of extrinsic evidence from the *Geary* matter, but was prevented from doing so by the court's ruling. Dkt. 111 at 26.  But even if Petitioner's cross-examination had been limited to questions answered directly by Lent, those questions still would have concerned his prior testimony in the *Geary* matter. The prosecution likely would have requested the opportunity to explain Detective Lent's *Geary* testimony more fully to the jury – to show that Detective Lent admitted to mistakes, not perjury. The prior mistakes still would not have been significantly probative, and the risks of prejudice and jury confusion would have remained.  Thus, even if the trial's judge's ruling could not be construed as precluding only extrinsic evidence, the basis for the ruling – that the risk of unfair prejudice and jury confusion outweighed the probative value of the cross-examination – was still sound.

- 33 -

visited the Temple Bar until 9:00 or 10:00 p.m. on May 13, the night of the murders.  Defendants were apprehended the following morning with evidence from the crime scene, including rolled coins with the business name stamped on the roll, a cushion cover matching the couch in Morrison's living room, car keys that fit a car left at the scene, a scanner that fit into the tow truck, and guns and ammunition that matched or were consistent with bullets fired at the scene.  Blood found on defendants' clothing was consistent with blood from the victims.

*Murray*, 184 Ariz. at 32, 906 P.2d at 565.  In addition to this evidence, Petitioner and his brother fled from officers in a high-speed chase when initially encountered near Holbrook on the morning after the murders; when captured, Petitioner had two spent shotgun shells in his back pocket that matched the gun in the car and were consistent with the shotgun blasts to each victim's head (there were no shotgun shells found at the scene); blood and tissue found on the cushion cover in Petitioner's possession was consistent with one of the victims; gloves were found in the car, consistent with the lack of fingerprints at the scene; fabric found at the scene and in the tow truck was consistent with one of the gloves; a single glove found in the car was consistent with an opposite-hand single glove found at the scene; and a license plate cover found at the scene matched the missing cover from Petitioner's car. This evidence established Petitioner's involvement in the murders beyond a reasonable doubt even without the footprint testimony of Detective Lent.  Thus, the trial court's ruling on Detective Lent's cross-examination, even if erroneous, did not have a substantial and injurious effect on the verdict.  *See Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993).

## V.    Claim 12

Petitioner alleges that the prosecutor intimidated a witness so that he would not testify on Petitioner's behalf, in violation of Petitioner's rights under the Fourteenth Amendment. Dkt. 111 at 41-44.  According to Petitioner, a bartender named Robert Grinder was prepared to testify that Petitioner was at Temple Bar until late in the evening of May 13, 1991, and consumed a large amount of hard liquor.  *Id.*  Petitioner asserts that the testimony would have established an alibi for Petitioner and would have been relevant to his state of

- 34 -

mind at the time of the murders.  *Id.*  Petitioner raised this claim in his PCR petition, and the

court summarily denied relief.  ME 4/24/97.  As set forth below, the claim is not supported

by the record and will be denied.

A.    Background

The foundation for Petitioner's claim that the State threatened or coerced Grinder and

prevented him from testifying is a passage in an affidavit prepared in 1997 by Petitioner's

PCR counsel, who described a conversation she had had with trial counsel:

> Ms. O'Neill advised me that during trial a recess was taken for
> purposes of interviewing the bartender.  Instead of Mr. Zack [the prosecutor]
> conducting the interview himself, one of the police detectives, who she
> believes was Detective Lent, interviewed the bartender.  During the interview,
> the Detective asked questions or made insinuations in a way which made the
> bartender obviously nervous.  Ms. O'Neill could not precisely recall what the
> statements were, although she remembered one insinuation that the bartender
> was illegally serving an intoxicated person (Petitioner and/or his brother).
> The bartender became very nervous and recanted his previous statements.

PCR petition, Ex. A at ¶ 5.  The assertions contained in this passage are contradicted by the

record.

At the opening of the defense case, Ms. O'Neill presented testimony from other

employees of the bar who observed the Murray brothers there on the night of May 13.  One

witness testified that the Murrays arrived at the bar at approximately 5:00 p.m. and were still

there, drinking unspecified beverages, when the witness left sometime between 9:00 and

10:00 p.m. RT 6/9/92, Vol. I, at 13-14.  He testified that Bob Grinder was the bartender that

night, and that Grinder was now living in Mexico.  *Id.* at 15.  Another witness testified that

the bar closed at 10:00 p.m. unless there were customers still present.  *Id.* at 9.  Following

these witnesses, the court took a recess.  *Id.* at 19.  It is at this point, apparently, that the

alleged witness intimidation occurred.  *See* Dkt. 111 at 42.  At the time, however, O'Neill

did not raise a claim of prosecutorial misconduct or witness intimidation, or make any

reference to Grinder's availability as a witness or his proposed testimony.

The next day, while discussing the defense's proposed jury instruction on voluntary

1    intoxication, Ms. O'Neill made the following comments:

2            For purposes of the record, I attempted to locate Robert Grinder. . . .
     My investigator found out after he left Temple Bar discovered that he was
3    moving to Mexico, as the Court heard testimony.  My investigator also
     discovered that he was receiving mail at an address in Tucson, Arizona.  I
4    prepared a subpoena for him and I had attempted to have it served at the
     address in Tucson, Arizona.  The address exists.  The people who live there
5    say yes, he has received mail here.  Specifically, that was the address that he
     gave for his last paycheck to be forwarded to.  Occasionally he comes back,
6    but he was out of the country and unavailable, and they declined to accept
     service of process for him.  We did make efforts to collect Grinder's
7    testimony and bring him up here today.

8            . . . I want the Court to be aware of the fact that we would have
     presented Mr. Grinder's testimony, had we been able to serve him, as to
9    intoxication.

10   RT 6/10/92, Vol. II, at 114-15.  Despite having the opportunity to explain that Grinder had

11   been present and prepared to testify the day before, as now alleged, Ms. O'Neill indicated

12   that she had been unable to locate him and secure his attendance.

13          The only record concerning the substance of Grinder's potential testimony is found

14   in the testimony of Petitioner's investigator and Detective Ingrassi at the sentencing hearing.

15   Questioned by defense counsel, the investigator testified as follows:

16       Q.      In the course of your investigation did you interview several different
17               people regarding Robert Murray?

18       A.      Yes.  I interviewed numerous people.

19       Q.      And did you speak with a person by the name of Robert Grinder or
                 Grender?

20
         A.      Yes, I did.
21
         Q.      And who is he?
22
23       A.      I spoke with a person that identified himself as Robert Grinder that
                 was a bartender at the Temple Bar area in Arizona.

24       Q.      And did you tape record that interview?

25       A.      No, I did not.

26       Q.      And why didn't you do that?

27

A.     At that point when I was contacted – when I contacted Mr. Grinder, that I was just there, he was an investigative lead into something that I was trying to develop.

Q.     And did you have any conversations about Robert Murray with Mr. Grinder?

A.     Yes, I did. In our conversation, first I – after several calls to the Temple Bar area I was able to contact and talk to him on the telephone, and he did identify himself as a bartender that was on duty the evening that I was inquiring about. And I identified – I identified two subjects that fit the description of Roger and Robert Murray, and he recalled that particular night. And I – I asked him about what was the activity there, and he told me.

Q.     And what did he tell you?

A.     He told me he recalled the two persons being in there.  This was late in the evening, and they were – they were drinking.

Q.     Did he indicate whether they were consuming alcoholic –

A.     Beverages, yes, I did. I asked him in specific if they were consuming hard liquor.

Q.     What did he tell you?

A.     He told me yes.

Q.     Did he indicate that they had a number of drinks?

A.     I didn't ask him specifically how many drinks, but he said something to the effect that he had been – they were there late and were having a good time.

Q:     And do you know whether or not Mr. Grinder subsequently moved away from the Temple Bar area?

A:     Yes. . . . As I understand it, he moved to Mexico.

RT 10/5/92 at 40-41. On cross-examination, the investigator testified that Grinder informed him that the Murray brothers "were pretty spirited" at the bar and he had to ask them to leave, which they did voluntarily. *Id.* at 51-53. There was no testimony regarding a specific time-frame for the Murrays' departure.

The State subsequently presented testimony from Detective Ingrassi, who interviewed Grinder "fairly early" in the case. RT 10/7/92 at 102. During the interview,

Grinder told Detective Ingrassi that the Murrays did not seem intoxicated when they left the bar. *Id.* at 102, 120. Detective Ingrassi further testified that Grinder had informed him that Petitioner was drinking Jack Daniels that night and had consumed four or five drinks in a three-hour period. *Id.* at 124-25. On cross-examination, defense counsel inquired whether Grinder could have been lying about the Murrays' state of intoxication in order to protect the bar's liquor license. *Id.* at 120. Again, at no point during the hearing did Petitioner assert that Grinder had been available to testify but was dissuaded from doing so or that he had recanted.

B.   Analysis

Criminal defendants have a due process right to present witnesses, compel their attendance, and present a defense. *Chambers v. Missipi*, 410 U.S. 284, 294 (1973). "It is well established that 'substantial government interference with a defense witness's free and unhampered choice to testify amounts to a violation of due process.'" *Earp v. Ornoski*, 431 F.3d 1158, 1170 (9th Cir. 2005) (quoting *United States v. Vavages,* 151 F.3d 1185, 1188 (9th Cir. 1998)). Coercive or threatening behavior towards a potential witness may justify reversal of a defendant's conviction. *See Webb v. Texas,* 409 U.S. 95, 98 (1972); *Williams v. Woodford*, 384 F.3d 567, 601-02 (9th Cir. 2004) ("Undue prosecutorial interference in a defense witness's decision to testify arises when the prosecution intimidates or harasses the witness to discourage the witness from testifying.").

Petitioner cites *Earp* and *Vavages* in support of this claim. Dkt. 111 at 43-44; Dkt. 117 at 35. These cases are distinguishable for two reasons. First, in *Earp* and *Vavages*, the allegations of witness intimidation were factually supported to a far greater extent than Petitioner's allegation here. Second, in *Earp* and *Vavages* the alleged prosecutorial misconduct resulted in the omission of evidence crucial to the defense.

Earp was accused of molesting and murdering an eighteen-month-old child who was left in his care at the child's home. 431 F.3d at 1165. At trial he testified that another

individual, Frank Morgan, was present at the home and committed the crimes. *Id.* Morgan testified that he had never been to the house and did not even know where it was located. *Id.* at 1165, 1168. Earp was convicted and sentenced to death. *Id.* at 1163-64. After the trial a defense investigator located a witness, Michael Taylor, who claimed that he had overheard Morgan tell another inmate that he had been to the house on the day the child was killed and that if Earp was released he would come after Morgan because of Morgan's false testimony. *Id.* at 1168. Taylor also claimed that he recanted his statement after being verbally abused and threatened by a sheriff's deputy and the prosecutor. *Id.* In support of his claim of prosecutorial misconduct, Earp submitted signed declarations from Taylor and a defense investigator, along with a transcript of the prosecutor's interview of the witness. *Id.* at 1168-69. On habeas review, the district court granted summary judgment against Earp. *Id.* at 1169. The Ninth Circuit reversed and remanded for an evidentiary hearing. *Id.* at 1172. The court found that Earp had presented a colorable claim of prosecutorial misconduct. *Id.* at 1170-72. The court also noted that, "because Earp's defense strategy at trial so clearly pitted Earp's credibility against Morgan's, evidence that Morgan was lying could have created a reasonable doubt with the jury that would have made the difference with Earp." *Id.* at 1171.

In *Vavages*, the defendant's alibi defense relied on the testimony of his wife and young children. 151 F.3d at 1187. On the first day of trial, the district court, after being informed that Vavages' wife intended to invoke her Fifth Amendment privilege against self-incrimination, held a hearing to determine whether the prosecutor had coerced her into refusing to testify. *Id.* The court found that the prosecutor had engaged in "intimidating" and troublesome" conduct by threatening to charge the defendant's wife with perjury and to withdraw her plea agreement in another matter if she testified in support of Vavages' alibi defense. *Id.* It was undisputed that the prosecutor contacted the wife's attorney several times and advised her attorney that his client should invoke her Fifth Amendment privilege

to avoid being prosecuted for perjury. *Id.* at 1188. In his closing argument, the prosecutor emphasized the fact that Vavages' alibi defense was supported only by the testimony of his own children. *Id.* 1191. The court of appeals found that the prosecutor substantially interfered with the wife's decision to testify and that the defendant was prejudiced. *Id.* at 1191-92.

In this case, Petitioner has offered no meaningful evidence to support his allegation that Grinder was coerced into recanting his testimony. The affidavit by PCR counsel offers only the second-hand recollections of trial counsel and appears to be contradicted by the contemporary record, which indicates that trial counsel had not located Grinder at the time of trial. RT 6/10/92, Vol. II, at 114-15. There is no evidence from trial counsel herself, let alone from Grinder, to support the version of events recounted in the affidavit. In fact, Ms. O'Neill signed a seven-page declaration in September 2006 detailing her concerns about Petitioner's trial. Dkt. 111, Ex. 12 at ¶ 15. The declaration discusses her actions with respect to Mr. Grinder and suggests that she should have been more diligent in procuring his testimony for trial, but makes no mention of the events on which this claim is based. *Id.* In sum, Petitioner has not presented facts sufficient to support a colorable claim of witness intimidation.

Moreover, Petitioner has not demonstrated prejudice. Grinder's testimony, if consistent with the information he provided Detective Ingrassi and the defense investigator, would not have established an alibi. Grinder's information as to the Murrays' presence at Temple Bar was consistent with the time-line established by other evidence. [13] Similarly,

---

[13] Petitioner incorrectly contends that Grinder's testimony concerning the Murrays' presence at Temple Bar would have demonstrated that they could not have committed the crimes in Grasshopper Junction within the time-line established by the evidence at trial. Temple Bar is located approximately fifty miles, or one hour to one hour and fifteen minutes' driving time, from the crime scene at Grasshopper Junction. RT 6/5/92 at 91-92. Grasshopper Junction is located approximately 230 miles, or three-and-a-half hours, from the location where the Murrays were apprehended at 7:45 a.m. *Id.* at 93. The total distance

Grinder's proposed testimony would have added little to the testimony of other Temple Bar employees who described Petitioner's consumption of alcohol prior to the murders; in any event, that information was presented at sentencing through the defense investigator.

**VI.   Claim 22**

Petitioner alleges that there was insufficient evidence to support the especially heinous, cruel or depraved aggravating factor as set forth in A.R.S. § 13-703(F)(6). Dkt. 111 at 44-50.  The Court does not agree.

A.   Background

The trial court found beyond a reasonable doubt that the murders were especially cruel and especially heinous or depraved.  ROA 212, 213.  With respect to the cruelty prong of (F)(6), the court cited the following facts:

> The victims . . . were kidnapped at gunpoint and forced to lie down in the living room. . . .  The invasion of the property occurred in the middle of the night and by surprise.  The victims had no opportunity to defend themselves or to summon aide [sic].  The victims clearly had significant time to consider the uncertainty of their fate.

*Id*.  The Arizona Supreme Court affirmed this finding.  *Murray*, 184 Ariz. at 37, 906 P.2d at 570.

With respect to the heinous or depraved prong, the trial court noted:

> [T]he evidence at Trial [sic] showed that the defendants inflicted gratuitous violence on the victims . . . They were shot numerous times with different weapons including shotgun blasts to the head.
>
> The evidence shows that the victims were helpless at the hands of the defendants when they were executed.  Both victims were elderly, clad in bath robes and lying on the floor.  The killings were senseless.  The murders occurred in a remote location.  The victims could not have summoned aid easily at night.  By killing the victims, the defendants gave themselves more

driven by the Murrays between Temple Bar and the location where they were apprehended is about 350 miles. *Id.* at 91-93.  Driving the speed limit, the Murrays could have covered that distance in approximately six hours, leaving them more than enough time to have committed the murders even if they had remained at Temple Bar well past 10:00 p.m. *See id.*

time to implement their escape plan.

        The only motive for the killings was to eliminate witnesses and assure the defendants [sic] escape from detection.

ROA 212, 213.

    The Arizona Supreme Court upheld the trial court's determination that the murders were especially heinous or depraved based on the findings of gratuitous violence, helplessness, and senselessness.[14]  *Murray*, 184 Ariz. at 37-38, 906 P.2d at 570-71.

    B.    Analysis

    Habeas review of a state court's application of an aggravating factor "is limited, at most, to determining whether the state court's finding was so arbitrary and capricious as to constitute an independent due process or Eighth Amendment violation." *Lewis v. Jeffers*, 497 U.S. at 780.  In making that determination, the reviewing court must inquire "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found that the factor had been satisfied." *Id*. at 781 (emphasis in original) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)).

    As the Arizona Supreme Court noted, the (F)(6) factor, phrased in the disjunctive, is satisfied if the murder is either especially heinous, or cruel, or depraved.  *Murray*, 184 Ariz. at 37, 906 P.2d at 570.  The especially cruel prong is satisfied "if the victim consciously experienced physical or mental pain and suffering prior to dying." *State v. Lopez*, 174 Ariz. 131, 143, 847 P.2d 1078, 1090 (1992).  Evidence about "[a] victim's certainty or uncertainty as to his or her ultimate fate can be indicative of cruelty and heinousness." *State v. Gillies*, 142 Ariz. 564, 569, 691 P.2d 655, 660 (1984); *see also State v. Kemp*, 185 Ariz. 52, 65, 912 P.2d 1281, 1294 (1996).  A rational factfinder could have found that the murders were especially cruel because the victims suffered uncertainty as to

_____

    [14] The court held that it was unnecessary to determine whether the factor was also supported, as the trial court found, by the element of witness elimination.  *Murray*, 184 Ariz. at 38, 906 P.2d 571.

their fate and Petitioner would reasonably have foreseen their suffering.  The Arizona Supreme Court held:  "Due to the execution style of the murders, Appelhans clutching Morrison's arm, in addition to the lacerations on Morrison and signs of struggle, the state proved beyond a reasonable doubt that the victims suffered from mental as well as physical pain and suffering before death."  *Murray*, 184 Ariz. at 37, 906 P.2d at 570.  Although Petitioner contends that the evidence is "inconclusive . . . that either victim was conscious beyond the first shot" (Dkt. 111 at 42), it is clear that both the trial court and Arizona Supreme Court based their finding of mental suffering on the fear and uncertainty the victims experienced before they were killed, when they were at the mercy of the two armed intruders.  This determination was supported by the evidence and did not constitute an arbitrary application of (F)(6).

To determine whether a murder was especially heinous or depraved, a court takes into account a number of circumstances, including the apparent relishing of the murder, the infliction of gratuitous violence on the victim, the mutilation of the victim's body, the senselessness of the crime, and the helplessness of the victim.  *State v. Gretzler,* 135 Ariz. 42, 51-52, 659 P.2d 1, 10-11 (1983).  The latter circumstances – helplessness and senselessness – are less probative of a defendant's state of mind, and, standing alone, generally will not support a finding of heinousness or depravity.  *Murray*, 184 Ariz. at 38, 906 P.2d at 571; *see State v. Gulbrandson*, 184 Ariz. 46, 67, 906 P.2d 579, 601 (1995) ("a finding of helplessness along with a finding of one of the other three *Gretzler* factors . . . will usually support a finding of especially heinous or depraved").

Because the evidence presented at trial, and relied on by the trial court and the state supreme court, supported several of these circumstances, a rational factfinder could have determined that the murders were especially heinous or depraved.  As the Arizona Supreme Court explained:

Gratuitous violence is supported by the numerous gunshot wounds to the

victims' heads with different weapons, displaying violence far beyond that necessary to kill. The victims were relatively elderly and helpless against the younger assailants. . . . [T]he victims could not have summoned aid easily, thus buttressing the finding of helplessness. The killings were senseless as they were unnecessary to defendants' goal of robbery.

*Murray*, 184 Ariz. at 38, 906 P.2d at 571 (citations omitted).

Petitioner contends that the firing of multiple shots into the victims' heads is insufficient to establish gratuitous violence. Dkt. 111 at 48. To the contrary, the violence committed against the victims, who were shot several times with different weapons while they were lying face down on the floor, went beyond what was necessary to kill. Along with wounds from two other guns, Ms. Appelhans suffered a contact wound to her head from a sawed off shotgun, a blast which spread her brain matter and other tissue across the room. If Petitioner's intent had been simply to kill, "less violent alternatives were readily available." *State v. Wallace*, 151 Ariz. 362, 368, 728 P.2d 232, 238 (1986).

Because the state courts' application of both prongs of the especially heinous, cruel, or depraved factor was not "so arbitrary and capricious as to constitute an independent due process or Eighth Amendment violation," *Lewis v. Jeffers*, 497 U.S. at 780, Petitioner is not entitled to habeas relief on Claim 22.

## VII.   The Law Governing Ineffective Assistance of Counsel Claims

Petitioner alleges that Ms. O'Neill's performance was constitutionally ineffective at both the guilt and sentencing stages of trial.[15] He presented these claims in his PCR petition. The PCR court rejected all but one of the IAC claims as not colorable, finding that Petitioner

---

[15] With his merits brief Petitioner has filed a declaration from Ms. O'Neill, dated September 26, 2006. Dkt. 111, Ex. 12. The Court has considered the declaration, in which Ms. O'Neill outlines the perceived shortcomings in her representation of Petitioner. The Court emphasizes, however, that in accord with *Strickland*, its review of Ms. O'Neill's performance is an objective one, and that pursuant to *Strickland*'s objective standard counsel's representation "must be only objectively reasonable, not flawless or to the highest degree of skill." *Dows v. Wood*, 211 F.3d 480, 487 (9th Cir. 2000) (citing *Strickland,* 466 U.S. at 688-89.)

had failed to show that counsel's performance fell below an objective standard of reasonableness and that the deficient performance resulted in prejudice. ME 4/24/97. With respect to the remaining claim, the court held an evidentiary hearing, after which it denied relief, finding that Petitioner failed to establish either deficient performance or prejudice. RT 3/25/98 at 67-68; ME 3/25/98.

The applicable law is set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). To prevail under *Strickland*, a petitioner must show that counsel's representation fell below an objective standard of reasonableness and that the deficiency prejudiced the defense. *Id*. at 687-88. The inquiry is highly deferential, and "every effort [must] be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Id.* at 689.

To satisfy *Strickland*'s first prong – deficient performance – a defendant must overcome "the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." *Id.* For example, while trial counsel has "a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary, . . . a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." *Id.* at 691. To determine whether the investigation was reasonable, the court "must conduct an objective review of [counsel's] performance, measured for reasonableness under prevailing professional norms, which includes a context-dependent consideration of the challenged conduct as seen from counsel's perspective at the time." *Wiggins v. Smith*, 539 U.S. 510, 523 (2003) (citation and quotation marks omitted). As the Supreme Court recently reiterated: "In judging the defense's investigation, as in applying *Strickland* generally, hindsight is discounted by pegging adequacy to 'counsel's perspective at the time' investigative decisions are made" and by applying deference to counsel's judgments. *Rompilla v. Beard*, 545 U.S. 374, 381 (2005) (quoting *Strickland*, 466

1  U.S. at 689).

2    Because an IAC claim must satisfy both prongs of *Strickland*, the reviewing court

3  "need not determine whether counsel's performance was deficient before examining the

4  prejudice suffered by the defendant as a result of the alleged deficiencies." *Strickland*, 466

5  U.S. at 697 ("if it is easier to dispose of an ineffectiveness claim on the ground of lack of

6  sufficient prejudice . . . that course should be followed").  A petitioner must affirmatively

7  prove prejudice.  *Id.* at 693.  To demonstrate prejudice, he "must show that there is a

8  reasonable probability that, but for counsel's unprofessional errors, the result of the

9  proceeding would have been different.  A reasonable probability is a probability sufficient

10  to undermine confidence in the outcome." *Id.* at 694.  The calculus involved in assessing

11  prejudice "should proceed on the assumption that the decision-maker is reasonably,

12  conscientiously, and impartially applying the standards that govern the decision." *Id.* at 695.

13    "When a defendant challenges a conviction, the question is whether there is a

14  reasonable probability that, absent the errors, the factfinder would have had a reasonable

15  doubt respecting guilt."  *Id.* at 695.  In answering that question, a reviewing court

16  necessarily considers the strength of the state's case. *See Allen v. Woodford,* 395 F.3d 979,

17  999 (9th Cir. 2005) ("even if counsel's conduct was arguably deficient, in light of the

18  overwhelming evidence of guilt, [the petitioner] cannot establish prejudice"); *Johnson v.*

19  *Baldwin*, 114 F.3d 835, 839-40 (9th Cir. 1997) (where state's case is weak, there is a greater

20  likelihood that the outcome of the trial would have been different in the absence of deficient

21  performance); *see also Morales v. Ault*, 476 F.3d 545, 551-53 (8th Cir. 2007); *Snow v.*

22  *Simmons*, 474 F.3d 693, 720-33 (10th Cir. 2007); *Atwater v. Crosby*, 451 F.3d 799, 810-11

23  (11th Cir. 2006); *Lundgren v. Mitchell*, 440 F.3d 754, 775-77 (6th Cir. 2006); *Leal v.*

24  *Dretke*, 428 F.3d 543, 549-52 (5th Cir. 2005); *Lindstadt v. Keane*, 239 F.3d 191, 204 (2d

25  Cir. 2001); *Buehl v. Vaughn*, 166 F.3d 163, 172 (3d Cir. 1999); *Huffington v. Nuth*, 140 F.3d

26  572, 580-83 (4th Cir. 1998); *United States v. Taveras*, 100 F.3d 995, 999 (C.A.D.C. 1996);

27

*Scarpa v. DuBois*, 38 F.3d 1, 16 (1st Cir. 1994).

Also inherent in the prejudice analysis is the principle that in order to demonstrate that counsel failed to litigate an issue competently, a petitioner must prove that the issue was meritorious. *See Kimmelman v. Morrison,* 477 U.S. 365, 375 (1986). Thus, with respect to allegations that counsel was ineffective for failing to file or properly litigate a motion, a petitioner "must show that (1) had his counsel filed the motion, it is reasonable that the trial court would have granted it as meritorious, and (2) had the motion been granted, it is reasonable that there would have been an outcome more favorable to him." *Wilson v. Henry*, 185 F.3d 986, 990 (9th Cir. 1999) (citing *Morrison,* 477 U.S. at 373-74); *see Boyde v. Brown*, 404 F.3d at 1173-74; *James v. Borg*, 24 F.3d 20, 27 (9th Cir. 1994). Therefore, in evaluating a number of the following IAC claims, this Court is informed by the holding of the Arizona Supreme Court on the merits of the underlying issues.

Under the AEDPA, this Court's review of the state court's decision is subject to another level of deference. *Bell v. Cone*, 535 U.S. 685, 698-99 (2002). Petitioner must make the additional showing that the state court's ruling that counsel was not ineffective constituted an unreasonable application of *Strickland*. 28 U.S.C. § 2254(d)(1).

Finally, the Court notes that the judge who presided over the trial also presided over the PCR proceeding. Thus, in considering Petitioner's IAC claims, the PCR court was already familiar with the record and the evidence presented at trial and sentencing. The judge's familiarity with the record provides this Court with an additional reason to extend deference to the PCR court's ruling. *See Smith*, 140 F.3d at 1271 (when the judge who governed the post-conviction proceeding is the same as the trial and sentencing judge, the court is considerably less inclined to order relief for that might approach "a looking-glass exercise in folly").

## VIII.  Claim 29

Petitioner alleges that trial counsel was ineffective when she failed to seek

appointment of a second lawyer to assist in his defense.  Dkt. 111 at 55-61.  In support of this claim, Petitioner relies on the recommendations of the American Bar Association, citing 1989 ABA Guideline 2.1.  Dkt. 111 at 55.  Respondents counter that the prevailing standard of practice at the time of Petitioner's 1992 trial did not require two appointed counsel in capital cases and that no state or Supreme Court precedent mandated the appointment of a second attorney.  Respondents are correct.  Rule 6.2 of the Arizona Rules of Criminal Procedure, requiring the presiding judge to appoint two counsel in capital cases, became effective on January 1, 1998.  *See State v. Lee*, 189 Ariz. 590, 601, 944 P.2d 1204, 1215 (1997).  Before that rule, Arizona law did not require the appointment of two counsel in capital cases.  *State v. Rodriguez*, 186 Ariz. 240, 249, 921 P.2d 643, 652 (1996).  Nor has Petitioner cited a decision from the United States Supreme Court establishing a per se rule that two counsel are required in all death penalty cases.

Petitioner instead focuses his argument on the ABA guidelines.  But as the Seventh Circuit has noted when addressing a similar argument based on the guidelines, "[t]he key word here is 'recommended.'  Trial counsel cannot be said to be constitutionally ineffective for deciding not to bring in co-counsel, unless there is some reason . . . why the first lawyer is unable to provide adequate representation." *Pitsonbarger v. Gramley,* 141 F.3d 728, 738 (7th Cir. 1998); *see Allen v. Woodford*, 395 F.3d 979, 998 (9th Cir. 2005).

Petitioner asserts that Ms. O'Neill lacked the experience to handle a capital trial without second counsel.  Dkt. 111 at 58-59.  In support of this proposition he offers the affidavit of Ms. O'Neill from September 2006 and her testimony at the evidentiary hearing during the PCR proceedings.  Dkt. 111, Ex. 12; RT 3/25/98.  According to Ms. O'Neill, her inexperience and heavy workload resulted in deficient representation and prejudiced Petitioner.[16]  *Id*.  In her declaration she attests that, "I know now, based upon my experience

---

[16] O'Neill graduated from law school in 1987 and was admitted to practice in Arizona in October 1987, when she began working in the Mohave County Public Defender's Office.

and learning, that I should have moved for the appointment of co-counsel.  My omission was a critical act of misjudgment which seriously prejudiced my client, especially in his mitigation defense."  Dkt. 111, Ex. 12 at ¶ 10.  O'Neill also noted that counsel for co-defendant moved for and received co-counsel.  *Id.* at ¶ 7.[17]

Petitioner's argument on this claim, however, focuses almost exclusively on Ms. O'Neill's lack of experience.  Nothing is said – other than a string cite to the other IAC claims discussed below – about the way in which she handled Petitioner's defense. Dkt. 111 at 60.  "In considering claims of ineffective assistance of counsel, it is not the experience of the attorney that is evaluated, but rather, his performance."  *LaGrand v. Stewart*, 133 F.3d 1253, 1275 (9th Cir. 1998); *Ortiz v. Stewart,* 149 F.3d 923, 933 (9th Cir.1998) ("[i]t is well established that an ineffective assistance claim cannot be based solely on counsel's inexperience" in capital cases).  Thus, O'Neill's failure to seek the appointment of second counsel can give rise to habeas relief only if this Court first determines that the absence of co-counsel prejudiced the defense.  *Cf. Allen v. Woodford*, 395 F.3d at 998 (no deficient performance unless the record shows that counsel was unable to try the case alone). Because Petitioner cites no instances of prejudice other than those discussed in the IAC claims addressed below (Dkt. 111 at 60), the Court will turn to those claims.  The Court notes, however, that its assessment of the cumulative effect of these claims does not

---

RT 3/25/98, Vol. I, at 5.  She served as Chief Deputy Public Defender, then left the office to head the Mohave County Legal Defender's Office.  During her four years at the public defender's office, she went to trial three or four times a year (*id.* at 23), but she had never gone to trial on a murder case or handled any aspect of a capital case (*id.* at 10).  While representing Petitioner, O'Neill continued to carry a full caseload at the Mohave County Legal Defender's Office, handling "a couple hundred cases" a year.  *Id.*, Vol. II, at 22, 46.

[17] Petitioner describes co-defendant's counsel, Frank Dickey, as "vastly more experienced than O'Neill." Dkt. 111 at 57.  According to O'Neill, however, both Dickey and his co-counsel lacked experience and were unqualified to try a capital case. Dkt. 111, Ex. 12 at ¶¶ 7, 8.

persuade the Court that Petitioner's IAC claim is well-taken any more than do the individual claims themselves. In addition to the defects in each individual IAC claim discussed below, the Court's review of the record shows that Ms. O'Neill represented Petitioner competently and with vigor during the entire trial and in the sentencing phase.

## IX.   Claim 30

Petitioner alleges that trial counsel was ineffective when she failed to adequately research and present the change of venue motion. Dkt. 111 at 61-66. As noted above, Ms. O'Neill filed a motion for change of venue, alleging that Petitioner would be "unable to receive a fair trial in Mohave County due to the massive amounts of prejudicial pre-trial publicity." ROA 107. Counsel for co-defendant filed a similar motion. ROA 92. After an evidentiary hearing on the issue of pretrial publicity, the court found that the defendants did not carry their burden of proof; at the invitation of all parties, however, the court reserved its ruling until jury selection. RT 4/22/92 at 110-11. Because a jury was successfully empaneled, the trial court denied the motion for a change of venue. RT 5/29/92, Vol. II, at 24. On direct review, the Arizona Supreme Court held that Petitioner "failed to show *what* pretrial publicity was so outrageous, resulting in a trial that was utterly corrupted." *Murray*, 184 Ariz. at 26, 906 P.2d at 559 (emphasis in original).

Petitioner has failed to show that counsel's performance with respect to the change of venue issue was deficient. With respect to O'Neill's performance, Petitioner does not specify what research O'Neill failed to perform or what additional evidence regarding pretrial publicity she could have presented. At the evidentiary hearing, O'Neill called her defense investigator as a witness and co-defendant's counsel called a local news writer and reporter. RT 4/22/92 at 15-50. The witnesses described community opinion on the case and the extent and nature of the media coverage. *Id.* Co-defendant's counsel also introduced the news scripts and articles Petitioner now relies on in support of Claim 1. *Id.* at 38. Contrary to Petitioner's argument, it is apparent from her examination of the reporter that

O'Neill was familiar with these materials. *See id.* at 33-35.

Moreover, Petitioner has not shown that he was prejudiced by O'Neill's performance. In attempting to meet his burden under the second prong of *Strickland*, Petitioner makes the bare assertion that if "O'Neill conducted thorough research of the media coverage of the case, she would have been able to adequately present to the judge an argument in support of community saturation." Dkt. 111 at 66. This conclusory statement is not sufficient to "affirmatively prove prejudice," *Strickland*, 466 U.S. at 693, particularly in light of the Arizona Supreme Court's determination that Petitioner suffered neither presumed nor actual prejudice from the pretrial publicity. *Murray*, 184 Ariz. at 26, 906 P.2d at 559.

The PCR court's denial of this claim was not based on an unreasonable determination of the facts or an unreasonable application of *Strickland*.  Petitioner is not entitled to relief on Claim 30.

## X.   Claim 31

Petitioner alleges that trial counsel was ineffective when she failed to file a timely motion regarding selection of the jury pool, failed to provide specific evidence showing that Petitioner was prejudiced, and failed to move to preserve the jury questionnaires. Dkt. 111 at 66-69.

### A.   Background

On May 5, 1992, counsel for co-defendant Roger Murray filed a motion challenging the jury pool, arguing that its composition violated his right to a fair cross-section of the community under *Duren v. Missouri,* 439 U.S. 357 (1979). Dkts. 120, 121.  He sought disclosure of all data relating to the composition of the jury pool and the jury-selection process, including completed jury questionnaires, and filed a subpoena for such records. *Id.* Ms. O'Neill joined the motion on Petitioner's behalf.  ROA 133.

In a hearing on the motion, the jury commissioner testified that a jury panel of 150 from a new jury pool could be available for trial on May 27 if jury questionnaires were sent

out on May 14.  RT 5/13/92 at 35-39.  The trial court ordered that a jury pool be selected from both the voter registration and drivers' license lists, as required by Arizona statute, and continued the trial from May 26 to May 27.  *Id*. at 21-23.  The court concluded that if the commissioner obtained a sufficient number of jurors from the blended list, the challenge to the jury pool on fair cross-section grounds would be denied.  *Id.* at 48-49.  The court also denied the discovery motion, but indicated to co-defendant's counsel that he could use his subpoena power to obtain the information.  *Id.* at 16.

Subsequently, co-defendant's counsel moved to continue the trial date to permit all of the questionnaires to be collected.  ROA 144; *see* RT 5/27/92 at 9-10.  Ms. O'Neill again joined the motion.  RT 5/27/92 at 29.  At a hearing on May 27, the jury commissioner informed the court that 9,800 questionnaires were sent out on May 19 and estimated that 4,000 to 5,000 had been returned.  *Id.* at 22, 27.  After excusing non-citizens and felons, along with other prospective jurors for reasons related to health, family, employment or because they no longer resided in the county, she had qualified 953 individuals and placed 700 of the qualified jurors into the jury pool.  *Id.* at 23-25.  She planned to select 150 jurors from that pool for Petitioner's trial.  *Id*. at 23.  At the conclusion of the commissioner's testimony, the trial court denied the motion to continue.  *Id.* at 29.  Jury selection commenced the next day.

B.     Analysis

Petitioner contends that Ms. O'Neill was ineffective in her litigation of this issue. He faults O'Neill for failing to subpoena the jury questionnaires, which, according to Petitioner, resulted in their destruction.  He speculates that, had the questionnaires been preserved, they would have supported a claim that a category of prospective jurors was systematically excluded in violation of *Duren*.  These allegations are without merit.

As to Ms. O'Neill's performance on this issue generally, the record shows that she joined the motions filed by co-defendant's counsel seeking disclosure of all information,

1  including completed questionnaires, concerning the jury-selection process in Mohave

2  County.  ROA 120, 121, 133.  Thus, she did challenge the jury pool composition.

3       On direct appeal, Petitioner argued that the process by which the jury pool was

4  assembled resulted in the exclusion of young, rural prospective jurors.  The Arizona

5  Supreme Court rejected this claim, holding that the "Defendants have not shown that they

6  lacked a fair and impartial jury or that they were prejudiced by the procedure that was used."

7  *Murray*, 184 Ariz. at 22-23, 906 P.2d at 555-56.  Citing *Duren*, the court further explained:

8       Defendants have not shown they were denied their right to a jury
     selected from a fair cross-section of the community.  Defendants failed to
9       show (1) the group alleged to be excluded is a "distinctive" group in the
     community, (2) the representation of this group in venires from which juries
10      are selected is not fair and reasonable in relation to the number of such
     persons in the community, and (3) the underrepresentation was due to
11      systematic exclusion of the group in the jury selection process.

12  *Id.*

13      Petitioner argues to this Court that he is precluded from making a *Duren* showing

14  because his counsel failed to obtain and preserve all jury questionnaires.  But whether

15  Petitioner could have made such a showing from the questionnaires is a matter of pure

16  speculation.  Petitioner does not identify which "distinctive group" was excluded or provide

17  any support for the other prongs of *Duren*.[18]

18      Nor can the Court conclude that habeas relief is warranted by Petitioner's inability

19  to review the questionnaires and construct an argument regarding the jury pool.  In *Thomas*

20  *v. Borg*, 159 F.3d 1147 (9th Cir. 1998), the Ninth Circuit rejected an IAC claim challenging

21  counsel's performance with respect to an underlying allegation that African-American jurors

22  were being excluded from jury panels.  *Id.* at 1152.  Although the reason for the petitioner's

23

24      [18] Petitioner does not offer a cite to the record to support his contention that the
25  questionnaires from his case were destroyed.  The questionnaires are not part of the record
     before this Court, but Petitioner does cite to questionnaires from at least nine jurors.
26  Dkt. 111 at 16 n.84.  Petitioner does not present any evidence in support of his jury panel
27  claim from the questionnaires that do exist or from the trial record of venire members.

"inability to provide . . . the requisite statistics is his trial counsel's failure to challenge the composition of the jury panel prior to trial, coupled with counsel's failure to preserve the relevant statistics at the time of trial," *id.* at 1150, the court nevertheless held that the petitioner was not prejudiced because, inter alia, "the evidence against [him] . . . was so overwhelming that it is hard to believe that any reasonable juror, black or white, would have voted to acquit him," *id.* at 1152.  The same is true here.  As noted above, compelling evidence established that Petitioner and his brother were present at Grasshopper Junction and committed the murders.  And the manner of the murders – execution-style slayings, at the time of a robbery, with multiple gunshots to the heads of the victims – established that they were premeditated.  There is no reasonable probability that a differently-composed jury would have returned a not-guilty verdict.

## XI.   Claims 32 and 33

In Claim 32, Petitioner alleges that trial counsel was ineffective when she failed to file a pretrial motion regarding the impeachment of Detective Lent, failed to impeach his testimony, and failed to retain an expert witness on behalf of the defense. Dkt. 111 at 69-77. In Claim 33, Petitioner alleges that trial counsel was unprepared to present or argue a pretrial motion to suppress the footprint evidence collected by Lent. *Id.* at 77-81. The Court does not agree.

Petitioner contends that "O'Neill failed to file a pretrial motion to preclude Detective Lent from testifying as an expert witness." Dkt. 111 at 70. This argument is simply incorrect. On April 1, 1992, O'Neill filed a motion seeking to preclude Detective Lent from testifying as an expert with respect to the footprint evidence. ROA 86. O'Neill argued that Lent did not possess the qualifications to perform footprint comparisons; that such evidence, and Detective Lent's methodology, did not comport with the standard established in *Fry v. United States*, 293 F. 1013 (D.C. Cir. 1923), for the admission of scientific evidence; and that the probative weight of such evidence was outweighed by its prejudicial nature. *Id.*

The trial court held an evidentiary hearing at which O'Neill called Detective Lent to testify regarding his qualifications and the methods he used in this case. RT 4/22/92 at 3-23. O'Neill examined Lent on the methods used by the FBI to photograph footprints, and the differences between Lent's practice and FBI procedure. *Id*. at 10-17. The court denied the suppression motion, finding that Detective Lent was qualified as an expert based on his training and experience, but noting that defense counsel had offered "good cross-examination questions regarding the weight" of Lent's testimony. *Id.* at 112. On direct appeal, the Arizona Supreme Court agreed that Detective Lent was qualified to testify as an expert. *Murray*, 184 Ariz. at 29, 906 P.2d 562. Given this record, it is clear that Ms. O'Neill did not perform ineffectively by failing to mount a pretrial challenge to Detective Lent's testimony. *See James*, 24 F.3d at 27; *Wilson v. Henry*, 185 F.3d at 990.

Petitioner argues that Ms. O'Neill was ill-prepared for the hearing on her motion to exclude the Lent testimony, that her examination of Detective Lent at the hearing was deficient, and that she erred in failing to call an expert to rebut his testimony at the hearing. Dkt. 111 at 77-81. The Court does not agree. Ms. O'Neill presented Detective Lent with FBI guidelines on the preservation of footprint evidence. She overcame prosecution objections to the use of the FBI materials, and proceeded to demonstrated that Detective Lent's procedures did not comport with FBI practices for the careful preservation of footprint evidence. RT 4/22/92 (Partial Transcript) at 10-17. Even the prosecutor agreed that Ms. O'Neill had presented information to effectively challenge the reliability of Lent's testimony, but he argued that Ms. O'Neill's arguments went to the weight, not the admissibility, of the testimony. RT 4/22/92 (Partial Transcript) at 112. The Court agreed, noting that Lent was qualified by training and experience, if not education, to opine on footprint evidence. *Id*. at 115. The Court does not find Ms. O'Neill's performance at the hearing to constitute ineffective assistance of counsel. She attacked Lent on precisely the issue Petitioner identifies – the reliability and admissibility of his opinions. She used

- 55 -

authoritative sources for the attack, overcoming prosecution objections in the process. And Petitioner presents no evidence or argument she could have used to rebut the extent of Lent's training and experience. The Court does not find that Petitioner has shown her performance at the hearing to be constitutionally inadequate.

Petitioner next argues that counsel failed to impeach Detective Lent's testimony at trial by challenging his expertise and by raising the prior incident of alleged perjury. In fact, counsel for both defendants cross-examined Detective Lent thoroughly, attacking his expertise and methodology, particularly his failure to cast and properly photograph the footprints. RT 6/2/92, Vol. I, at 3-94; 6/2/92, Vol. II, at 31-35; 6/10/92, Vol. I, at 27-33, 35-39. Petitioner identifies no specific omission or misstep committed by Ms. O'Neill that would indicate that she was unprepared to handle Detective Lent's trial testimony or performed incompetently. Such unsupported allegations of ineffectiveness do not entitle Petitioner to relief. *James*, 24 F.3d at 26 ("Conclusory allegations which are not supported by a statement of specific facts do not warrant habeas relief."); *see also Bragg v. Galaza*, 242 F.3d 1082, 1088-89 (9th Cir. 2001) (no IAC based on failure to investigate and question witness where there was no indication of what additional information could have been gained, and prosecution's case against defendant was strong); *Dows v. Wood*, 211 F.3d 480, 486 (9th Cir. 2000) (no IAC based on failure to prepare adequately even though counsel did not interview witnesses or conduct investigation and did not contact possible alibi witness where the record showed that counsel was familiar with facts of case and had definite defense strategy).

Moreover, as discussed previously with respect to Claim 10, counsel for co-defendant Roger Murray did attempt to impeach Detective Lent with his testimony in the *Geary* case, an effort joined by Ms. O'Neill. RT 6/2/92, Vol. I, at 3-15. The trial court declined to permit the attempted impeachment, and the Arizona Supreme Court affirmed that decision. Given these rulings, any further attempt on O'Neill's part to impeach based on the *Geary*

case would have been futile. *James*, 24 F.3d at 27. Similarly, given these rulings, Petitioner has not shown that counsel's citation of the *Geary* matter would have made a difference in her pretrial suppression motion.

To support his claim that Ms. O'Neill erred in failing to retain a footprint expert, Petitioner has submitted a letter dated September 2006 from Joel Hardin of Joel Hardin Professional Tracking Services. Mr. Hardin criticizes Detective Lent's investigation as "amateurish," especially in its lack of documentation, and characterizes the detective's conclusions as unsupported and hypothetical. Dkt. 111, Ex. 13. Mr. Hardin states, however, that his observations are "preliminary," that he was not given copies of the exhibits used during Detective Lent's trial testimony, but only "[s]ome pictures that purport to relate to prosecution exhibits presented at trial," and that he does not know "the relationship between the picture materials furnished and the [trial] transcript." *Id*. Mr. Hardin then expresses opinions based on his review of Detective Lent's testimony in a different case where, unlike this case, full evidentiary materials were provided to him. *Id*. Mr. Hardin also notes that defense counsel in this case brought out several of the points he finds problematic in Detective Lent's testimony. *Id*. Mr. Hardin's opinion is preliminary, based on incomplete information, and fails to identify significant issues that were not raised at trial by counsel for Petitioner and his brother.

Moreover, the defense did present an expert witness at trial to counter the testimony of Detective Lent. Counsel for co-defendant Roger Murray called Jack Nelson, an experienced crime-scene investigator, to testify during the defense case-in-chief. Mr. Nelson testified at length about the inadequacies of Detective Lent's investigation. RT 6/10/92, Vol. I, at 50-79; RT 6/10/92, Vol. II, at 3-50. He testified that the footprint evidence was not properly protected, analyzed, or preserved. Like Mr. Hardin, he opined that the crime scene was not properly documented. And he explained why Detective Lent's conclusions were unreliable. *Id*. This was not a trial, as Petitioner suggests, where

Detective Lent's testimony went unrebutted. The Court cannot conclude that the preliminary letter of Mr. Hardin reveals a defense strategy that would have been more effective than presenting the testimony of Mr. Nelson.

Given the pre-trial motion filed by Ms. O-Neill, her and co-counsel's cross-examination of Detective Lent, and the testimony of expert witness Nelson, Petitioner has failed to show that counsel performed deficiently or that he was prejudiced by counsel's performance. *See Bower v. Quarterman*, 497 F.3d 459, 471-72 (5th Cir. 2007) (decision not to call an expert witness to rebut the state's ballistics evidence did not constitute deficient performance where counsel felt that the ballistics evidence was weak and brought out those weaknesses in cross-examination of the state's experts); *cf. Wildman v. Johnson*, 261 F.3d 832 (9th Cir. 2001) (speculation as to what expert might say "is insufficient to establish prejudice"); *see Grisby v. Blodgett,* 130 F.3d 365, 373 (9th Cir. 1997) (same).

Moreover, given the overwhelming evidence that Petitioner and his brother were at the scene and participated in the murders, as recounted above, the Court concludes that Petitioner would have been convicted even without the footprint evidence. The Court does not find a "reasonable probability" that, but for Detective Lent's footprint testimony, "the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694.

## XII.   Claim 34

Petitioner alleges that Ms. O'Neill failed to communicate diligently with him regarding "the basic factual and legal details of his case." Dkt. 111 at 81-85. According to Petitioner, if Ms. O'Neill had communicated with him more effectively, including informing him of "applicable law," he would have been able to identify mitigating and exculpatory facts and explain away inculpatory information. *Id.* at 84. Petitioner claims that these difficulties were exacerbated when Ms. O'Neill relocated to Tucson. *Id.* at 83.

An attorney has a duty to consult with her client regarding important decisions and to keep the client "informed of important developments in the course of the prosecution."

*Strickland,* 466 U.S. at 688. But while "limited consultations may constitute deficient performance by a criminal defense attorney," *Summerlin v. Schriro*, 427 F.3d 623, 633 (9th Cir. 2005), "brevity of consultation time between a defendant and his counsel alone cannot support a claim of ineffective assistance of counsel." *United States v. Lucas*, 873 F.2d 1279, 1280 (9th Cir. 1989) (per curiam) (quoting *Chavez v. Pulley,* 623 F.Supp. 672, 685 (C.D.Cal. 1985)). This is so especially where the defendant "fails to allege what purpose further consultation with his attorney would have served and fails to demonstrate how further consultation with his attorney would have produced a different result." *Id.*

Petitioner fails to identify a single fact he would have shared with counsel had communications occurred more regularly. He likewise fails to identify the legal issues about which counsel failed to consult him, or how such failure affected his defense. Petitioner's conclusory allegations do not establish prejudice under *Strickland*. *See James*, 24 F.3d at 26.

Nor does the record support Petitioner's claim that he did not have regular contact with Ms. O'Neill and that her move to Tucson further impaired communications. *See Lucas*, 873 F.2d at 1280 (defendant failed to show of "how the distance between Phoenix and Tucson prevented [consultation] or . . . impaired the quality of his representation"). At the evidentiary hearing during the PCR proceedings, O'Neill testified that she devoted a greater portion of her time to Petitioner's case *after* she moved to Tucson. RT 3/25/98 at 29. With respect to communications, she stated that before moving to Tucson she visited with Petitioner every two or three weeks for half an hour or so; after the move, she visited him at least once a month, a total of five or six times, for about forty-five minutes per visit. *Id.* at 15. In addition, Petitioner communicated by letter with defense investigator John Freeman, who also visited him in person a few times. *Id.* at 16-17. It appears from this record that, contrary to Petitioner's unsupported allegations, he was afforded the opportunity to consult with counsel and to communicate whatever facts he believed were relevant to his

- 59 -

1   defense.  The Court finds Claim 34 to be without merit.

2   **XIII.  Claim 35**

3       Petitioner alleges that trial counsel was ineffective when she failed to move for

4   severance on the grounds of antagonistic defenses or to establish that antagonistic defenses

5   existed.  Dkt. 111 at 85-90.

6       A.    Background

7       Prior to trial, Ms. O'Neill filed a motion to sever Petitioner's trial from that of his co-

8   defendant, arguing that Petitioner would be prejudiced by the spillover effect caused by the

9   introduction of evidence that implicated Roger Murray but not Petitioner. ROA 55.  O'Neill

10  later filed a "renewed motion to sever," arguing that Roger Murray's defense of duress

11  would necessitate the introduction of statements by Petitioner and thus create a *Bruton*

12  problem.  ROA 113.  O'Neill moved a third time for severance during trial, arguing that

13  Roger Murray, by calling sheriff's officers to attack the quality of the investigation, allowed

14  the State to use cross-examination of the officers to strengthen its case. RT 6/9/92, Vol. II,

15  at 25-27.  She added, "I believe at this point the defenses are sufficiently incompatible to

16  deprive them of a fair trial."  *Id*. at 25.  The trial court denied the motion, finding that the

17  defenses were not antagonistic and noting that "[b]oth defendants have attacked the

18  investigation, both have pointed out, throughout the State's case, problems they believe the

19  State has had . . . and I guess that's exactly what [co-defendant's counsel] is trying to do

20  with this, and I don't see the inconsistency."  *Id*. at 27.  Finally, Ms. O'Neill moved for a

21  mistrial based on the tactics employed by Roger Murray's counsel.  RT 6/10/92, Vol. I, at

22  42-45.  The trial court denied this motion as well.  *Id*.

23      The Arizona Supreme Court held that the trial court did not err in denying severance.

24  *Murray*, 184 Ariz. at 25, 906 P.2d at 558.  The court explained that "Defendants failed to

25  show prejudice. The evidence implicated both defendants equally.  Neither defendant made

26  a statement, testified at trial, or presented an antagonistic defense."  *Id.*

27

- 60 -

1

   B.   Analysis

2    Petitioner contends that the severance motion filed by O'Neill was "generic" and

3 failed to cite the existence of antagonistic defenses as a grounds for severance. Dkt. 111 at

4 86. These complaints do not form a basis for habeas relief.

5    Petitioner cannot establish that he was prejudiced by counsel's performance. He has

6 made no showing that, had counsel moved more aggressively for severance, the trial court

7 would have granted the motion. Both the trial court and the Arizona Supreme Court

8 determined that the defenses were not antagonistic. *Murray*, 184 Ariz. at 25, 906 P.2d at

9 558. That determination is supported by the trial record, which demonstrates that the

10 defenses were consistent, with both Petitioner and Roger Murray attacking the quality of the

11 investigation, challenging the time-line, and arguing that reasonable doubt existed as to

12 whether the brothers had actually committed the murders as opposed to simply taking

13 possession of the stolen goods after the victims were dead. *See, e.g.*, RT 6/11/92 at 10-35,

14 37-63. Contrary to Petitioner's assertion, Roger Murray did not base his defense on an

15 accusation that Petitioner was the actual shooter.

16    In addition, the specific facts identified by Petitioner in support of this claim all

17 concern the alleged poor tactics of Roger Murray's counsel rather than the presence of

18 inconsistent defense theories. Petitioner claims, for example, that co-counsel slept during

19 trial, called witnesses who reinforced the state's case against both defendants, and elicited

20 evidence damaging to both defendants, such as a description of the high-speed chase that

21 preceded their arrest. Dkt. 111 at 88-89. Petitioner cites no evidence to support his claim

22 that Ms. O'Neill should have pressed more vigorously for severance because the defenses

23 were mutually antagonistic. By definition, mutually antagonistic defenses force the jury to

24 disbelieve the core of one defense in order to believe the core of the other, so that a jury's

25 acceptance of one party's defense precludes the acquittal of the other party. *See United*

26 *States v. Rashkovski*, 301 F.3d 1133, 1137-38 (9th Cir. 2002). Mere antagonism between

27

1   defenses is not a sufficient basis for severance.  *See United States v. Throckmorton*, 87 F.3d

2   1069, 1072 (9th Cir. 1996).

3          Furthermore, given the strength of the evidence against each defendant, and the

4   prophylactic measures taken by the trial court, Petitioner cannot demonstrate that he was

5   prejudiced by the joint trial.  *See Rastafari v. Anderson*, 278 F.3d 673, 689-90 (7th Cir.

6   2002) (habeas petitioner not entitled to relief under *Strickland* because, even if severance

7   had been appropriate under state law, there was no reasonable probability of a different

8   outcome if petitioner had been tried separately).  As the Arizona Supreme Court explained,

9   the trial court addressed the potential prejudice ensuing from a joint trial by using a jury

10  questionnaire that asked whether the venire members would have trouble keeping the

11  defendants separate during trial; those who answered affirmatively were questioned

12  individually by the court and counsel.  *Murray*, 184 Ariz. at 25, 906 P.2d at 558.   In

13  addition, at the close of the case, the trial court provided the following jury instruction:

14              You are instructed that you must consider the evidence presented by
15          the State separately as to each of the defendants in this case. You must
            determine whether or not the State has proved the charges against each
16          defendant beyond a reasonable doubt. If you find that the State has proved its
            case against one of the defendants but not the other, you must reflect that in
17          your verdict.

18  RT 6/12/92 at 33.  The Arizona Supreme Court held that:

19              With such an instruction, the jury is presumed to have considered the
            evidence against each defendant separately in finding both guilty. *See Parker
20          v. Randolph,* 442 U.S. 62, 73, 99 S.Ct. 2132, 2139, 60 L.Ed.2d 713 (1979).
            The trial judge committed no error in denying the motions to sever. "[I]n
21          cases where the crimes of the two defendants are so intertwined that it is
            difficult, if not impossible, to separate proof of one defendant's crimes from
22          that of the co-defendant's, it would be a waste of resources to require
            individual trials." *State v. Wiley,* 144 Ariz. 525, 532, 698 P.2d 1244, 1251
23          (1985), *overruled on other grounds by State ex rel. Criminal Div. of Attorney
            Gen.'s Office v. Superior Court ex rel. Maricopa County,* 157 Ariz. 541, 760
24          P.2d 541 (1988).

25  *Murray*, 184 Ariz. at 25, 906 P.2d at 558.

26          There was overwhelming evidence that both Petitioner and Roger Murray

27

                                    - 62 -

participated in the murders.  The effect of that evidence would not have changed had the trials been severed.

## XIV.  Claim 36

Petitioner alleges that trial counsel was ineffective when she failed to object to the introduction of a series of photographic slides that had not been disclosed to the defense. Dkt. 111 at 90-93.  At trial, the State introduced a set of slides taken of footprints found at the crime scene.  RT 6/2/92, Vol. II, at 4-5.  Co-defendant's counsel objected, claiming that he had not seen the slides prior to trial and that the State had not laid the proper foundation for their admission.  *Id.* at 5-6.  Ms. O'Neill indicated that she too would object unless a proper foundation was laid.  *Id.* at 6.  The trial court overruled the non-disclosure objection subject to foundational requirements.  *Id.*  Because the trial court overruled the very objection Petitioner faults O'Neill for failing to make, Petitioner cannot show prejudice. O'Neill's performance cannot be characterized as ineffective based on her failure to make or join a futile objection.  *See James*, 24 F.3d at 27.

## XV.  Claim 37

Petitioner alleges that Ms. O'Neill's failure to call exculpatory witnesses constituted ineffective assistance.  Dkt. 111 at 93-97.  The claim makes reference to three such witnesses:  Robert Grinder, John Anthony, and Thomas Ward.  *Id.*; *see* Dkt. 20 at 119-20. Respondents contend that this claim was exhausted in state court only with respect to potential witness Anthony and that Petitioner has failed to establish a *Strickland* violation with respect to any of the witnesses.  Dkt. 114 at 49-51.

A.     Grinder and Ward

Respondents are correct that, with respect to the allegations in this claim, Petitioner presented the PCR court only with the contention that counsel performed ineffectively by failing to call Anthony as an exculpatory witness.  PCR petition at 25-26; *see* PR at 15-17. The court held an evidentiary hearing on the claim that "[f]ailure to call Mr. Anthony as a

witness" constituted ineffective assistance (ME 4/24/97), at which Ms. O'Neill testified about her efforts to locate and secure Anthony as a defense witness.  RT 3/25/98.  After the hearing, the PCR court determined that Petitioner had failed to meet his burden under *Strickland*:

> . . . I don't find prong one to be proven.  I don't believe Ms. O'Neill acted incompetently by not getting that witness [Anthony] to trial, because I don't think she – I think she did try to get that witness and he was not available.
>
> And, secondly, even if it was incompetent, it would not have made a difference as far as the verdict was concerned.

*Id.* at 68.

Petitioner did not present the PCR court with IAC claims based on counsel's handling of Grinder and Ward.  Therefore, those aspects of Claim 37 are not properly before this Court on federal habeas review.[19]

Even if the Court were to consider the merits of these allegations, Petitioner would not be entitled to habeas relief.  With respect to Grinder, the Court previously considered and rejected the contention that his proposed testimony was exculpatory.

With respect to Thomas Ward, Petitioner contends that O'Neill performed ineffectively in failing to call him as a witness because he would have testified that another individual not fitting Petitioner's physical description purchased the shotgun that was used to shoot both victims, and that he was unable to pick Petitioner out of a photographic lineup.[20]  Dkt. 111 at 95.  The Court disagrees that counsel's performance here was deficient or prejudicial.

---

[19]  The allegations are technically exhausted but procedurally defaulted because Petitioner no longer has an available state remedy.  Ariz. R. Crim. P. 32.2(a)(3); *Coleman v. Thompson*, 501 U.S. 722, 735 fn.1 (1991).  Because Petitioner has not attempted to demonstrate either cause and prejudice or a fundamental miscarriage of justice, the allegations are procedurally barred.

[20]  O'Neill filed a motion to preclude Ward from making an in-court identification of Petitioner.  ROA 59.  The court granted the motion.  RT 10/6/92 at 152-54.

1    Ward was called by the prosecution to testify at the sentencing hearing.  RT 10/7/92

2    at 58-78.  He stated that he sold a full-barreled shotgun on May 11 or 12, 1992, to a

3    heavyset forty-year-old man driving a smaller white Ford sedan.  *Id.* at 65-66, 75.

4    Subsequently, Detective Ingrassi testified that the serial number of the shotgun sold by Ward

5    matched that of the sawed-off shotgun found, along with a hacksaw, in the white Ford

6    Tempo driven by Petitioner.  *Id.* at 86.  He also testified that corrections officers had

7    intercepted a coded letter written by Petitioner, in which Petitioner wrote that the man who

8    sold them the gun was unable to identify them but that he did identify the gun.  *Id.* at 93-99;

9    *see* ROA 382.  Had Ms. O'Neill attempted to present Ward's testimony at trial, she likely

10   would have prompted cross-examination of him about similarities between Petitioner and

11   the individual to whom Ward sold the gun and opened the door to evidence linking the

12   weapon sold by Ward to the sawed-off shotgun found in Petitioner's possession.  This

13   evidence would not have been beneficial to Petitioner.  O'Neill's decision not to call Ward

14   was therefore neither incompetent nor prejudicial to the defense.

15          B.    Anthony

16          The PCR court did not unreasonably apply *Strickland* when it rejected Petitioner's

17   IAC claim based on O'Neill's failure to call potential witness Anthony.  Petitioner alleges

18   that Anthony could have testified that he observed three men standing around a blue car that

19   was parked at Grasshopper Junction at around 10:00 p.m. on the night of the murders.  Dkt.

20   111 at 94-95.  According to Petitioner, "Inexplicably, O'Neill did not even interview, much

21   less call Anthony to the witness stand.  O'Neill did not even attempt to introduce these

22   statements through the police detective [Ingrassi] who took the statement from Anthony."

23   *Id.* at 95.  At trial, co-defendant's counsel attempted repeatedly to admit Anthony's

24   statements through the testimony of Detective Ingrassi; the court sustained the State's

25   foundation and hearsay objections.  RT 6/5/92 at 136-42; *see* RT 3/25/98 at 67.

26          At the PCR evidentiary hearing, O'Neill testified that she was aware of Anthony's

27

statement to the detective and had "instructed my investigator to find him so we could have him testify." RT 3/25/98 at 34. She further testified that it was her practice to subpoena a witness for trial if she knew his location, but in this case she was not sure she had an address or any other location where Anthony could have been served. *Id*. at 35. A report prepared by the defense investigator and dated May 27, 1992 – the day before jury selection – stated that he had not yet contacted Anthony, but that he would be able to contact him at a future date. *Id.* at 39. O'Neill testified that she should have moved for a continuance to give her time to secure Anthony's testimony. *Id.* at 11, 40. In denying Petitioner's IAC claim, however, the trial judge explained that, even crediting the information in the investigator's report, he would not have granted a motion for a continuance on the eve of trial. *Id.* at 67-68. Given Ms. O'Neill's efforts to locate Anthony, Petitioner fails to show how her performance fell below the minimum competence required by *Strickland*.

Moreover, Petitioner cannot establish that he was prejudiced by the failure to present Anthony's testimony. Assuming Anthony would have testified consistently with what he told Detective Ingrassi, his testimony would have placed others at Grasshopper Junction on the night of the murders. As already noted, however, compelling evidence connected Petitioner to the crime scene and to the murders. When Petitioner and his brother were captured after attempting to flee from law enforcement, they were found with money from Grasshopper Junction, the blood- and tissue-spattered couch cushion, two weapons consistent with the murders, two expended shotgun shells consistent with the murders, blood on their clothes consistent with blood of the victims, the scanner from the victims' tow truck, and a map with Grasshopper Junction circled. There is no a reasonable probability that Anthony's testimony would have altered the jury's verdict.

## XVI.  Claim 39

Petitioner contends that trial counsel was ineffective when she failed to prepare for and properly cross-examine Detective Ingrassi. Dkt. 111 at 97-101; *see* Dkt. 20 at 123-24.

Specifically, Petitioner challenges Ms. O'Neill's alleged failure to emphasize discrepancies in Detective Ingrassi's testimony about a shell discovered after the initial investigations and failure to cross-examine Ingrassi about the presence of other suspects at the crime scene. *Id*. Respondents contend that this claim was exhausted in state court only with respect to the shell testimony and that Petitioner has failed to establish a *Strickland* violation with respect to either IAC allegation.  Dkt. 114 at 52-54.

A.    Cross-examination regarding shell

Detective Ingrassi testified that while he and another officer were searching the Morrison residence on May 23, 1991, ten days after the murders, the officer informed him that he had seen an item in the southeast bedroom. RT 6/4/92, Vol. II, at 75. When Ingrassi went to look for the item, he found a .38-caliber Colt shell casing on the dark-colored carpet underneath a dresser. *Id.* at 76-77. According to Petitioner, a photograph taken the day after the murders depicts the same dresser but does not show a shell. Dkt. 111 at 99. Petitioner contends that O'Neill failed to "highlight this probative and illustrative discrepancy" during her cross-examination of Detective Ingrassi. *Id.*

The allegation that counsel's performance was either deficient or prejudicial – or that a discrepancy actually existed between the photograph and Ingrassi's testimony – is wholly conclusory.  Counsel for both defendants were aware of the evidence and addressed it during their closing arguments.  Counsel for co-defendant Roger Murray cited the late discovery of the shell as evidence that the investigation of the crime scene was unprofessional. RT 6/11/92 at 17. Ms. O'Neill discounted the evidentiary significance of the shell, noting that it was found in a "totally different room" from where the shootings occurred and "could have been under there for ages." *Id.* at 46-47. The tactical decision to characterize the shell as having no evidentiary significance, as opposed to using the allegedly inconsistent photograph to challenge Detective Ingrassi on cross-examination, is entitled to deference under *Strickland*. 466 U.S. at 689, 691. That deference withstands

Petitioner's bare assertions that counsel's handling of the issue was unprofessional and prejudicial.

B.    Other suspects

Respondents are correct that Petitioner presented the PCR court only with the claim that counsel performed ineffectively during her cross-examination of Detective Ingrassi with respect to the shell.  PCR petition at 26-27; *see* PR at 17-18.  Petitioner's claim that O'Neill performed ineffectively by failing to cross-examine Ingrassi about other potential subjects is therefore procedurally defaulted and not properly before this Court.

The claim is also based on an incorrect premise.  Petitioner asserts that Detective Ingrassi testified that there had not been any reports of unidentified persons at the crime scene on the night of the murders – contrary to reports he had received in interviews – and that Ms. O'Neill failed to reveal and capitalize on this inaccurate testimony.  Dkt. 111 at 100-101.  But Detective Ingrassi in fact testified that there were unidentified people at Grasshopper Junction at 11:00 p.m. on the night of the murders.  RT 6/10/92 at 133.  When co-defendant's counsel inquired whether the investigation revealed that individuals from Dolan Springs had been at the scene, the trial court sustained the State's objection on hearsay grounds.  *Id*. at 133-40.  The Court cannot conclude that Ms. O'Neill erred by failing to elicit a fact that was already before the jury – that there were unidentified individuals at the crime scene during the relevant time frame.  Nor can the Court conclude that she somehow erred by filing to contest the trial court's ruling on the State's hearsay objection.  *See James*, 24 F.3d at 27 (failure to take a futile action does not constitute IAC).

Petitioner has also failed to show prejudice.  Had the court allowed further testimony on this subject, the jury would have learned little in the way of additional facts – only that Detective Ingrassi was informed that three unidentified individuals and a blue car were at Grasshopper Junction sometime between 10:00 and 11:00 p.m. on the night in question.  There is no reasonable probability that this information would have altered the outcome of

the trial given the overwhelming evidence establishing Petitioner's presence at the scene and his involvement in the murders.  Petitioner is not entitled to relief on Claim 39.

## XVII. Claim 40

Petitioner alleges that trial counsel performed ineffectively by failing to prepare adequately for the sentencing stage of trial.  Dkt. 111 at 101-08.  Principally, Petitioner contends that Ms. O'Neill failed to present a complete picture of Petitioner's troubled childhood and failed to hire appropriate mental health experts. *Id.*  Respondents counter that the PCR court's rejection of this claim was not an unreasonable application of clearly established federal law, and that the evidence Petitioner contends should have been presented was cumulative to the evidence that counsel did present.

A.   Background

The presentence hearing was held on October 5-7, 1992.  According to her declaration, Ms. O'Neill began to prepare for sentencing after Petitioner was convicted, on June 12, 1992.[21]  Dkt. 111, Ex. 12, ¶ 17.

Prior to the hearing, Ms. O'Neill prepared a pre-sentence memorandum in which she argued that the following mitigating circumstances warranted a sentence less than death: a life sentence would adequately protect society; Petitioner was capable of rehabilitation; Petitioner was intoxicated at the time of the murders, and the murders would not have occurred if he had not been intoxicated and in the company of his brother; Roger Murray was the leader and Petitioner was less involved in the killings; and Petitioner's dysfunctional childhood affected his ability to conform his conduct to the standards of society.  ROA 208.

---

[21] Despite Ms. O'Neill's assertion, it is evident that the defense was in contact with members of Petitioner's family prior to trial.  For example, the record contains letters from Petitioner's uncle and aunt from April 1992 responding to inquiries from Ms. O'Neill.  ROA 208, Hulon Murray letter, 4/6/92; Ruby Bradford letter, 4/11/92.  Similarly, a friend of Petitioner's, when interviewed by the defense investigator in August 1992, indicated that he had answered similar questions from Ms. O'Neill six or seven months earlier. *Id.*, David Lovelace interview, 8/5/92.

In support of these arguments, Ms. O'Neill provided the court with a report from forensic psychiatrist Dr. Jack Potts, which recounted Petitioner's "psycho-social history," with an emphasis on the various difficult circumstances of his childhood and family background. Potts report, 9/29/92. Ms. O'Neill also offered a variety of documentary evidence, including Petitioner's jail records and criminal history from Alabama, as well as transcripts of interviews conducted by the defense investigator with relatives and friends who described Petitioner's childhood and family life. *Id.* Dr. Potts reviewed this information in preparing his report. *Id.*

At the presentence hearing, Ms. O'Neill presented testimony from Detective Ingrassi and the defense investigator and from Petitioner's mother and aunt. RT 10/5/92. This evidence established that Petitioner's father was a violent and physically abusive man who ran a nightclub and bookmaking operation and treated his son as an employee rather than a child, that Petitioner's family life was dysfunctional, and that Petitioner suffered from urinary and fecal incontinence, conditions which left him socially isolated. *Id.*

As noted previously, the court found three aggravating factors:  the murders were committed for pecuniary gain, they were especially cruel, heinous, or depraved, and Petitioner committed multiple homicides.  RT 10/26/92 at 78-80.  With respect to mitigation, the court found that Petitioner had failed to prove that his participation in the murders was relatively minor pursuant to A.R.S. § 13-703(G)(3) because the evidence showed that the defendants acted in concert and did not support Petitioner's contention that his brother was the leader. *Id.* at 81-82.  The court also rejected two of the nonstatutory mitigating factors put forward by Ms. O'Neill.  *Id.* at 83-85.  The court found that the evidence did not establish that Petitioner was intoxicated at the time of the crimes and that the protection of society by a life sentence was not a relevant mitigating factor. *Id.*

The court accepted as nonstatutory mitigation that Petitioner could be rehabilitated and that he had "suffered from a dysfunctional childhood." *Id.* at 83-84.  With respect to

the latter circumstance, the court explained:  "The defense produced witnesses and transcripts of witnesses at the hearing which support the defense contention that the defendant was subjected, as a child, to abnormal physical abuse, inconsistent discipline, and a dysfunctional environment."  Quoting Dr. Potts's report, the court continued:

> Robert was condemned by having a father who was overly rigid and a mother who was overly permissive and protected him from the wrath of his father. Because of his large size he was the subject of physical punishment on almost daily occurrences.  Being a bedwetter until his early teens was embarrassing enough, but suffering from fecal incontinence contributed to his feelings of not being understood.  And later, the defendant was reared in an environment not conducive to good role modeling.  The mother was overprotective, with the father being distant, harsh, and relatively uncaring.  As a boy, Robert Wayne Murray suffered from shame and isolation because of his urinary and bowel problems.  These were neither recognized nor treated, condemning him to being an outcast.

*Id.* at 84.

The trial court stated that it had "considered each of the mitigating circumstances offered by the defendant, and looked in the record for any other mitigation, and found none" and "that [the] mitigating circumstances proved to exist are not sufficiently substantial to outweigh the aggravating circumstances proved by the State and to call for leniency."  *Id.* at 85.  The court sentenced Petitioner to death.

B.    Analysis

The right to effective assistance of counsel applies not just to the guilt phase, but "with equal force at the penalty phase of a bifurcated capital trial."  *Silva v. Woodford*, 279 F.3d 825, 836 (9th Cir. 2002) (quoting *Clabourne v. Lewis*, 64 F.3d, 1373, 1378 (9th Cir. 1995)).  In assessing whether counsel's performance was deficient under *Strickland*, the test is whether counsel's actions were objectively reasonable at the time of the decision.  The test is "not whether another lawyer, with the benefit of hindsight, would have acted differently, but 'whether counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment.'"  *Babbitt v. Calderon*, 151 F.3d 1170, 1173 (9th Cir. 1998) (quoting *Strickland,* 466 U.S. at 687).

With respect to prejudice at sentencing, the *Strickland* Court explained that "[w]hen a defendant challenges a death sentence . . . the question is whether there is a reasonable probability that, absent the errors, the sentencer . . . would have concluded that the balance of aggravating and mitigating circumstances did not warrant death."  466 U.S. at 695.  In *Wiggins*, the Court further noted that "[i]n assessing prejudice, we reweigh the evidence in aggravation against the totality of available mitigating evidence."  539 U.S. at 534.  The "totality of the available evidence" includes "both that adduced at trial, and the evidence adduced in the habeas proceeding."  *Id.* at 536 (quoting *Williams v. Taylor*, 529 U.S. at 397-98).

The clearly-established federal law governing this claim includes the Supreme Court's decision in *Bell v. Cone*, 535 U.S. 685 (2002), which clarifies the standard this Court must apply in reviewing the PCR court's rejection of Petitioner's sentencing-stage IAC claim.  After noting the deferential standards set forth in the AEDPA and required by its own precedent, the Supreme Court explained that for a habeas petitioner's IAC claim to succeed:

> he must do more than show that he would have satisfied *Strickland*'s test if his claim were being analyzed in the first instance, because under § 2254(d)(1), it is not enough to convince a federal habeas court that, in its independent judgment, the state-court decision applied *Strickland* incorrectly.  Rather, he must show that [the state court] applied *Strickland* to the facts of his case in an objectively unreasonable manner.

*Id.* at 698-99 (citation omitted).

In the following discussion the Court will compare the evidence that was presented at sentencing with the evidence Petitioner contends should have been presented to determine whether Petitioner has satisfied his burden with respect to either prong of *Strickland*.

1.    Full picture of Petitioner's family background

     a.    Evidence presented at sentencing

Petitioner contends that Ms. O'Neill should have called for additional testimony from

Petitioner's family and friends for the purpose of "elaborating and clarifying" the "fragmented" picture of Petitioner's upbringing that was presented at the presentence hearing through the testimony of his mother and aunt. Dkt. 111 at 104. Petitioner also asserts that counsel failed to review relevant information, including Petitioner's school, prison, and employment records. *Id.* at 103.

At the presentence hearing, Ms. O'Neill first introduced through the testimony of Detective Ingrassi a taped interview with a jailhouse informant who reported that Roger Murray told him that he, Roger, was the shooter at Grasshopper Junction. RT 10/5/92 at 28-39. Ms. O'Neill then called her investigator, John Freeman, who discussed the information he had obtained regarding potential witness Robert Grinder and who introduced a series of transcripts of interviews he had conducted with Petitioner's family and friends. *Id.* at 39-54.

The witnesses interviewed by Freeman included Petitioner's uncle, Hulon Murray; Pete Hardee, a friend and co-worker; Tommy Hallman, a family friend and former employer; Joyce Michael, Petitioner's ex-wife; Doug Price, a childhood friend; and David Lovelace, another childhood friend. *Id.* at 42-51; *see* ROA 208. In a letter to Ms. O'Neill, Petitioner's uncle, a retired attorney, described Petitioner's "home environment" as "dismal," with an "illiterate" mother who "exhausted a good deal of effort to keep Robert's little transgressions from his father"; the father, in turn, was "essentially an absentee parent" and "simply ignored what was going on." ROA 208, Hulon Murray letter, 4/6/92. Consistent with their neglectful upbringing, the boys were exposed to weapons at an early age. *Id.* Although Hulon Murray believed that the brothers might suffer from mental defects and have low IQs, they were never seen by a psychiatrist. *Id.* According to Murray, "The total circumstances of Robert's upbringing amounted to mental conditioning and even 'brainwashing' toward uncivil conduct." *Id.* He further described Petitioner's mother and father as "toxic parents" who were partially accountable for Petitioner's conduct. *Id.* In an interview with the defense investigator, Hulon Murray described Petitioner as abnormally

quiet and withdrawn. ROA 208, Hulon Murray interview, 8/4/92. He also recounted Petitioner's bowel problems. *Id.*

The other individuals interviewed indicated that Petitioner was easy-going, reserved, and not violent. *See* ROA 208. Several described Roger Murray as meaner and more violent than Petitioner. *See id.*, Tommy Hallman interview, 8/6/92. Petitioner's ex-wife stated that his father forced him to grow up before his time. *Id.*, Joyce Michael interview, 8/7/92. She also stated that Petitioner's son loved him. *Id.* Doug Price stated that Petitioner was a good guy who was slow in school but otherwise normal. *Id.*, Doug Price interview, 8/5/92. He also indicated that Petitioner was "brought up in a rough atmosphere," that he was always being yelled at and cussed out, and that the Murray boys were raised without supervision and essentially raised themselves. *Id.* David Lovelace indicated that Petitioner was basically brought up in the clubs owned by his father. *Id.*, David Lovelace interview, 8/5/92.

At the presentence hearing, Ms. O'Neill also presented testimony from Ruby Bradford, Petitioner's aunt, and Brenda Murray, his mother. RT 10/5/92 at 54-75. Ms. Bradford, a retired school teacher, recalled that Petitioner suffered from a bowel problem which caused him to have accidents while riding the school bus. *Id.* at 57. Petitioner's parents did not seek medical help for this condition. *Id.* at 59. Ms. Bradford described Petitioner as a quiet child and a loner. *Id.* at 58. In a letter written to Ms. O'Neill and introduced at sentencing, Ms. Bradford further explained that Petitioner's parents became angry when it was suggested that they seek medical attention for Petitioner; they believed he was just being lazy. ROA 208, Ruby Bradford letter, 4/11/92. She stated that the other kids would make fun of Petitioner when he had his accidents. *Id.* She also indicated that there was a conflict between Petitioner's parents over discipline, with Petitioner's father being strict and his mother attempting to keep things from him. *Id.* Ms. Bradford was concerned that this dynamic might result in the boys "not regarding the truth too highly."

*Id.* Ms. Bradford repeated this information in an interview with the defense investigator. *Id.*

Petitioner's mother, Brenda Murray, testified that his father, Ken, used physical discipline on Petitioner. RT 10/5/92 at 63-64. He hit petitioner with his fists, once breaking his hand on Petitioner's head. *Id.* at 67. Mrs. Murray saw her husband strike Petitioner with his fists approximately a dozen times. *Id.* at 71. He also hit Mrs. Murray. *Id.* at 70. Mr. Murray was very demanding with Petitioner. *Id.* at 64. He forced Petitioner to quit school at age sixteen so that Petitioner could go to work for him. *Id.* He once made Petitioner work digging fence posts even though he had a broken collarbone. *Id.* 66. He also forced Petitioner to get married at age sixteen. *Id.* at 66. Mr. Murray was a bookie and club-owner. *Id.* at 64. Petitioner worked as a bouncer at his father's clubs; in that capacity he was calm and talked problems out rather than resorting to violence. *Id.* at 67-68. With respect to Petitioner's bowel problems, Mrs. Murray stated that she did take Petitioner to see a doctor, but that her husband believed Petitioner was just lazy. *Id.* at 65.

          b.    New evidence

Petitioner contends that Ms. O'Neill's performance was deficient because she "failed to contact Murray's closest childhood friends, Jerome Copeland and Jeffrey Gibson, and his two sisters, Angie Hall and Shonna Murray." Dkt. 111 at 104. Petitioner has presented affidavits from these individuals, along with portions of Petitioner's school records, in order to support the claim that O'Neill's presentation of his dysfunctional background as a mitigating factor was constitutionally ineffective. *Id.*, Exs. 1-11. Contrary to Petitioner's arguments, however, these individuals are unable to provide significant information that was not presented to the court at sentencing.

Angie Hall, Petitioner's sister, attests that her parents never praised, hugged, or said they loved the children; that her father had an affair with an employee at one of his clubs, resulting in her parents' divorce; and that Petitioner was a hard worker. *Id.*, Ex. 7.

- 75 -

Petitioner's friend Jerome Copeland states that he and Petitioner began using drugs and alcohol starting in the sixth grade; that Petitioner was struck by his father, resulting in black eyes and bruises; that Petitioner suffered from fecal incontinence; and that when Petitioner slept over at Copeland's residence, Copeland's grandparents commented on Petitioner's hygiene. *Id.*, Ex. 8. This drug and alcohol abuse was not described by other interviewees at sentencing, but was documented by Dr. Potts.

Petitioner's other sister, Shonna Murray, provides additional details of abuse, stating that Mr. Murray smacked the boys on the back of the head, pulled their hair, shoved them, and kicked them; he punished Petitioner more severely than Petitioner deserved, once hitting him in the head when he caught Petitioner driving his car before Petitioner had his license. *Id.*, Ex. 10. She also recounts an incident in which Petitioner injured his foot with an axe, but his father didn't take him to the hospital. *Id.* Shonna Murray characterizes her parents' marriage as unhappy and the mother as passive and controlled by the father, not being allowed to leave the house except to go grocery shopping. *Id.* She was aware that her father beat her mother, although she did not witness the incidents. *Id.* She describes her father as a big-time gambler and bookmaker who sent Petitioner on rounds to collect gambling debts. *Id.* She explains that Petitioner wanted a relationship with his father, but Mr. Murray did not allow them to become close. *Id.* She characterizes Petitioner, in contrast to his younger brother Roger, as non-violent and lacking a temper. *Id.*

Petitioner's other childhood friend, Jeffrey Gibson, recounts that Petitioner soiled his pants and was not liked at school because of his large size. *Id.*, Ex. 11. He states that other children were not allowed to play with the Murrays because of the father's gambling activities. *Id.* According to Gibson, Mr. Murray involved Petitioner in his gambling business at a young age. *Id.* He also describes an incident when Mr. Murray hit Petitioner in the face and kicked him after he caught Petitioner stealing money from his office safe. *Id.*

1

c.    Deficiency analysis

2      Ms. O'Neill performed reasonably at sentencing.  In establishing that Petitioner had

3  suffered from a dysfunctional family life, O'Neill and the defense team gathered school and

4  prison records, conducted interviews with friends and family, engaged a forensic

5  psychiatrist, and presented compelling testimony.  The professionalism and thoroughness

6  of her presentation stands in stark contrast with the performance of counsel in *Rompilla v.*

7  *Beard*, 545 U.S. 374 (2005), *Wiggins v. Smith*, 539 U.S. 510 (2003), and *Williams v. Taylor*,

8  529 U.S. 362 (2000) – cases in which counsel failed to discover and present readily

9  available mitigating information.

10     *Rompilla*'s counsel, for example, did not examine a file concerning a previous crime

11  despite the fact that the prosecution was using the offense as an aggravating factor; if

12  counsel had reviewed the file, they would have discovered a wealth of mitigating

13  information about Rompilla's childhood and mental health that was "very different[] from

14  anything defense counsel had seen or heard."  545 U.S. at 390-91.  Similarly, in *Wiggins*

15  trial counsel failed to present evidence, readily available from school records and medical

16  reports, of the defendant's "excruciating life history," 539 U.S. at 537, which involved

17  "severe privation and abuse in the first six years of his life while in the custody of his

18  alcoholic, absentee mother" followed by "physical torment, sexual molestation, and repeated

19  rape during his subsequent years in foster care," *id.* at 535.  In *Williams*, sentencing counsel

20  "failed to conduct an investigation that would have uncovered extensive records graphically

21  describing Williams's nightmarish childhood, not because of any strategic calculation but

22  because they incorrectly thought that state law barred access to such records."  529 U.S. at

23  395.  By contrast, Ms. O'Neill's sentencing-stage performance on Petitioner's behalf

24  resulted in the presentation of a mitigating case that does not differ qualitatively from the

25  case Petitioner now contends should have been presented.

26

27

d.   Prejudice analysis

Ms. O'Neill did not, as Petitioner asserts, present a misleading and "overly rosy picture" of his childhood and social history. Dkt.111 at 105. While the affidavits filed in this habeas proceeding contain some new information, describing specific instances of beatings and offering supporting details concerning the family's dynamics, they do not alter the overall picture counsel presented at sentencing.  "The mere fact that other witnesses might have been available or that other testimony might have been elicited from those who testified is not a sufficient ground to prove ineffectiveness of counsel." *Waters v. Thomas*, 46 F.3d 1506, 1514 (11th Cir. 1995) (quotation omitted) (failure to elicit additional mitigating information from defendant's sisters was not IAC where counsel called expert and lay witnesses to testify about defendant's character and "rough childhood"); *see also Babbitt*, 151 F.3d at 1175 (no prejudice where counsel failed to present cumulative mitigating evidence); *St. Pierre v. Walls*, 297 F.3d 617, 633 (7th Cir. 2002) ("Simply because there is additional evidence of a rough life, deprived childhood, or mental instability does not necessarily make it less likely the death sentence will be imposed.").  As detailed above, the trial court found that Petitioner had proven that his dysfunctional childhood constituted a mitigating factor. RT 10/26/92 at 84. *See Marquard v. Secretary for Dept. of Corrections*, 429 F.3d 1278, 1308 (11th Cir. 2005) ("There is no reason to believe that added details about Marquard's troubled childhood and substance abuse – which the sentencing court clearly recognized in imposing a death sentence – would have had any effect on the sentence.").

Petitioner also contends that Ms. O'Neill performed ineffectively by failing to obtain his school records for use in his mitigation case.  This assertion is belied by the record.  Dr. Potts indicated that he reviewed Petitioner's school records when preparing his report.  The records provided by Petitioner in this habeas proceeding, consisting of report cards from sixth, seventh, and ninth grade, indicate that, with the exception of physical education,

Petitioner was a mediocre student, receiving mostly Cs and Ds.  Dkt. 111, Ex's 2, 6.  In his report, Dr. Potts accurately described Petitioner's school performance as "average to poor, only excelling in physical education."  Potts report, 9/29/92 at 3.

Similarly, counsel did not perform ineffectively by failing to obtain Petitioner's prison and employment records.  Counsel obtained and presented documents from Petitioner's file with the Alabama Department of Corrections, and Dr. Potts reviewed the records in preparing his report.  *Id.* at 1-2.  Dr. Potts also recounted Petitioner's "work history."  *Id.* at 4.  O'Neill argued in her sentencing memorandum that the lack of disciplinary infractions in Petitioner's prison record and his positive employment history were factors indicating that he could be rehabilitated.  ROA 208 at 9.  The trial court agreed that Petitioner's potential for rehabilitation constituted a mitigating factor.  RT 10/26/92 at 83-84.

In sum, the Court concludes that Petitioner was not prejudiced by counsel's failure to present the trial court with additional details concerning his family and social history.

2.     Expert mental health testimony

Petitioner contends that Ms. O'Neill presented, through Dr. Potts's report, only "limited and inappropriate" evidence of Petitioner's mental condition.  Dkt. 111 at 107. Petitioner further asserts that Ms. O'Neill should have retained different types of mental health experts, including a neuropsychologist. *Id.*

a.     Evidence presented to trial court

As noted, at sentencing Ms. O'Neill provided the court with a report prepared by Dr. Potts, a forensic psychologist.   Dr. Potts met with Petitioner on three occasions.  Potts report, 9/29/92 at 1.  He also reviewed letters from Petitioner's friends and family, transcripts of interviews with family and friends, school records, and records from Petitioner's juvenile and adult criminal file, and spoke briefly with Petitioner's mother. *Id.* at 1-2.

In his report, Dr. Potts details Petitioner's social and psychological background, including his bed-wetting and fecal incontinence and the corporal punishment administered by his father. *Id.* at 2-7. Dr. Potts reported that Petitioner began experimenting with alcohol and drugs, including inhalants, prior to the age of fifteen. *Id.* at 3, 6. He also indicated that Petitioner had experienced two seizures of "unknown etiology" at age fourteen; however, there were no "sequelae" to these events, and Petitioner's mother noted no changes in his behavior. *Id.* at 3, 5. Dr. Potts further reported that Petitioner had no genetic predisposition for mental illness, and there was no family history of psychiatric disorders or sociopathy. *Id.* at 3. He noted that Petitioner himself had no history of psychiatric treatment; that there was no evidence of "personal disturbances" or hallucinations; that Petitioner's cognitive abilities were consistent with his education level, which included obtaining a GED; and that Petitioner's memory was "grossly intact." *Id.* at 2. Dr. Potts also concluded, based on Petitioner's history of steady employment and monogamous relationships, as well as the apparent lack of prior violence in his record, that Petitioner did not have an antisocial personality disorder. *Id.* at 6. Dr. Potts stated that Petitioner's "medical history is relatively insignificant," and did not report that Petitioner had experienced any head injuries. *Id.* at 3.

Dr. Potts specifically addressed Petitioner's mental condition at the time of the crimes. He accepted as truthful Petitioner's report that he and his brother drank constantly and used cocaine and marijuana during their travels from Alabama to Las Vegas. *Id.* at 5. Although Petitioner had not used cocaine for three days prior to the killings, he had consumed "copious amounts of alcohol." *Id.* Based on this information, Dr. Potts opined: "There is probably very little doubt as to his having been acutely intoxicated at the time of the offense. However, there is no evidence either proffered by the defendant or that I could recall from the records provided indicating any mental disorder or defect other than acute intoxication." *Id.*

In concluding his report, Dr Potts advocated leniency for Petitioner:

. . . [E]ven though the defendant was involved in the very ghastly murder of two innocent individuals, it is clear it would not have occurred had he not been acutely intoxicated and with his brother.  The defendant shows remorse for the deceased victims and empathy, as well as remorse, for the surviving victims.  He is clearly rehabilitatable.  A mitigated, or at the least non-aggravated, sentence is warranted.

*Id.* at 7.

    b. <u>New evidence</u>

  In support of his allegation that Ms. O'Neill was ineffective in her presentation of expert evidence concerning Petitioner's mental health, Petitioner offers new evidence consisting of a letter from Dr. Barry Morenz, a psychiatrist, and a report prepared by Dr. Richard Kobell, a forensic neuropsychologist.  Dkt. 111, Ex's 14, 15.

  In a letter dated September 28, 2006, Dr. Morenz opines that Petitioner "was a psychologically disturbed and distressed young man, and it is likely he continues to have serious psychological problems."  Dkt. 111, Ex. 14.  He suggests that the seizures Petitioner experienced as an adolescent may indicate brain damage caused by inhalation of lighter fluid and gasoline.  *Id.*  In Dr. Morenz's opinion, Petitioner's "humiliating incontinence, his brutally abusive father, the loveless home he lived in, his possible brain damage, and his family's neglect are extremely significant factors in assessing his mental health."  *Id.*  Dr. Morenz advocates further investigation.  *Id.*

  Dr. Kolbell performed a neuropsychological evaluation of Petitioner, consisting of a forensic interview and the administration of a battery of tests.  Dkt. 111, Ex. 15.  His report, dated August 11, 2006, concludes that Petitioner suffers from "Anxiety Disorder, NOS with Prominent Social Anxiety, Panic Attacks and Obsessive Features."  *Id.* at 13.  Dr. Kolbell's evaluation indicates that Petitioner has an IQ in the "high-average" range but suffers from "cognitive deficits" in the form of "low-average range memory" and attention problems, as well as impaired emotional functioning.  *Id.*  at 13-14.  According to Dr. Kolbell, this "neurological dysfunction" may be accounted for organically by events such

as head injuries and exposure to violence, physical abuse, and toxins. *Id.* In this context, Dr. Kolbell enumerates several head injuries reported by Petitioner. *Id.* at 5. Dr. Kolbell faults the defense for failing to conduct a "comprehensive work-up of multiple medical, neuropsychological, and psychosocial factors" in order to illuminate Petitioner's mental condition at the time of the offenses; in particular, he notes that if Petitioner had undergone neurologic evaluation prior to trial, such testing would have "shed light on the organic, neurologic components of [his] condition." *Id.* at 15.

c.    Deficiency analysis

Petitioner has not demonstrated that Ms. O'Neill performed deficiently in relying on Dr. Potts's expertise. Dr. Potts did not put counsel on notice that Petitioner might have suffered from any kind of neurological deficiency. "An attorney is not required to be so expert in psychiatry," *Pruett v. Thompson*, 996 F.2d 1560, 1574 (4th Cir. 1993), and counsel's reliance on Dr. Potts, an experienced forensic psychiatrist, was objectively reasonable. *See Turner v. Calderon*, 281 F.3d 851, 876 (9th Cir. 2002) (explaining that the choice of what type of expert to use is one of trial strategy and entitled to deference and rejecting claim that counsel's use of a "general psychologist" rather than a more specialized expert constituted IAC); *Campbell v. Coyle*, 260 F.3d 531, 555 (6th Cir. 2001) (counsel reasonably relied on a "trained psychologist" who failed to discover the petitioner's alleged post-traumatic stress disorder). In addition, even if Ms. O'Neill had discovered the type of deficits noted by Dr. Kolbell, her approach at sentencing – emphasizing Petitioner's intoxication at the time of the crimes, the emotional damage caused by his traumatic childhood, and his capacity for rehabilitation – represented a reasonable tactical choice. *See Bonin v. California*, 59 F.3d 815, 834 (9th Cir. 1995) (counsel's decision not to investigate or present evidence of brain damage or other psychiatric disorder at penalty phase was not IAC where counsel decided to rely principally on an "institutional adjustment" mitigation theory and feared that presentation of psychiatric testimony would open the door to allow

1    the prosecution to recite the horrible details of each of the murders).

2                d.    <u>Prejudice analysis</u>

3        According to Petitioner, "all of the[] factors" discussed by Dr. Morenz, including

4    Petitioner's incontinence and the abuse and neglect that characterized his family life, "were

5    overlooked by O'Neill when she prepared for and presented Murray's case in mitigation."

6    Dkt. 111 at 107. This simply is not true. The record shows that counsel at sentencing

7    emphasized Petitioner's bowel and bladder problems and his dysfunctional upbringing. For

8    example, contrary to Petitioner's assertion, Dr. Potts specifically addressed the emotional

9    and psychological impact of Petitioner's urinary and fecal incontinence, explaining that

10    these conditions resulted in "low self-esteem" and feelings of "isolation, shame, and not

11    being understood," caused Petitioner to be "condemned to be an outcast," and led to "anti-

12    social behavior." Potts report, 9/29/92 at 6-7.

13        The Court also finds that Petitioner has not established prejudice with respect to the

14    allegation that Ms. O'Neill performed ineffectively at sentencing by failing to discover and

15    present the cognitive deficiencies noted by Dr. Kolbell. Through Dr. Kolbell's finding,

16    Petitioner has demonstrated that a neuropsychologist, as opposed to a forensic psychiatrist

17    like Dr. Potts, might have discovered that Petitioner has a "low-average" memory, attention

18    problems, and emotional difficulties, and that these conditions might be organically based

19    and caused by external events. Petitioner has not shown, however, that there is a reasonable

20    probability that such information would have resulted in a different sentence.

21        The trial court was aware that Petitioner had been exposed to violence as a child, that

22    he had suffered seizures, that he had abused drugs, including toxic vapors, that he had

23    performed poorly in school, and that his dysfunctional home-life and incontinence had

24    caused emotional problems and led to anti-social behavior. It is not apparent that offering

25    expert testimony ascribing an organic basis to Petitioner's conduct, or diagnosing him with

26    low-average memory and attention problems, would have been a more effective tactic than

27

presenting Dr. Potts's opinion that Petitioner's crimes were the product of intoxication and his brother's influence and that Petitioner was not an antisocial personality but was capable of taking responsibility for his actions, feeling remorse, and being rehabilitated.

Courts have recognized that mental health evidence is a "double-edged sword," particularly when counsel focuses his mitigation argument on the defendant's character or amenability to rehabilitation. *Truesdale v. Moore,* 142 F.3d 749, 754 (4th Cir. 1998) (counsel exercised reasonable strategic judgment by "steer[ing] away from" evidence of organic brain dysfunction, "calculating that it would not help portray [Petitioner] as normal and capable of rehabilitation"); *Cannon v. Gibson*, 259 F.3d 1253, 1277-78 (10th Cir. 2001) (omitted mitigation information of "serious brain damage" and lack of impulse control would have displaced mitigation information portraying the petitioner as a "kind, compliant, and responsible individual whose involvement in the murder was an aberration"). Moreover, where the aggravating factors are powerful, and counsel have presented other psychiatric evidence in mitigation, courts have found that failure to present additional information concerning organic brain damage does not constitute IAC. *See Clark v. Mitchell*, 425 F.3d 270, 287 (6th Cir. 2005) (no prejudice where counsel failed to introduce additional mitigating evidence, including evidence of organic brain syndrome, drug addiction and withdrawal, and troubled childhood, given that the evidence which was not offered by counsel did not significantly expand upon information that was available to jury); *Knighton v. Mullin*, 293 F.3d 1165, 1178-79 (10th Cir. 2002) (defendant was not prejudiced by counsel's failure to obtain neuropsychological testing given that state's case against defendant in both phases of trial was strong, the record supported three aggravating factors found by the jury, counsel presented a great deal of psychiatric evidence at sentencing, and evidence that defendant suffered from "significant organic brain damage" would not outweigh evidence supporting multiple aggravating factors); *Santellan v. Cockrell*, 271 F.3d 190, 198 (5th Cir. 2001) (failure to introduce evidence that defendant suffered from organic

brain damage did not constitute IAC because there was no substantial likelihood that the outcome of the punishment phase would have been altered); *Cannon*, 259 F.3d at 1277-78; *cf. Sims v. Brown*, 415 F.3d 569, 581-86 (9th Cir. 2005) (failure to present equivocal evidence of organic brain damage did not constitute deficient performance where counsel presented other expert testimony and "heart-wrenching" mitigation evidence).

C.   Conclusion

"It is common practice for petitioners attacking their death sentences to submit affidavits from witnesses who say they could have supplied additional mitigating circumstance evidence, had they been called, or . . . had they been asked the right questions." *Turner v. Crosby*, 339 F.3d 1247, 1279 (11th Cir. 2003) (quoting *Waters,* 46 F.3d at 1513-14). Such information is not a basis for habeas relief where, as here, it establishes "at most the wholly unremarkable fact that with the luxury of time and the opportunity to focus resources on specific parts of a made record, post-conviction counsel will inevitably identify shortcomings in the performance of prior counsel." *Id.*

The new information offered by Petitioner to support his IAC allegations is largely cumulative. It does not significantly alter "the sentencing profile presented to the sentencing judge." *Strickland,* 466 U.S. at 700; *see Babbitt,* 151 F.3d at 1175; *Woods v. McBride*, 430 F.3d 813, 826 (7th Cr. 2005) (rejecting IAC claim that "boil[ed] down to the contention that counsel did not present enough mitigating evidence"); *Eddmonds v. Peters*, 93 F.3d 1307, 1322 (7th Cir. 1996) ("[W]e are certain counsel's failure to throw a few more tidbits from the past or one more diagnosis of mental illness onto the scale would not have tipped it in Eddmonds' favor."); *Hill v. Mitchell*, 400 F.3d 308, 319 (6th Cir. 2005) ("to establish prejudice, the new evidence that a habeas petitioner presents must differ in a substantial way – in strength and subject matter – from the evidence actually presented at sentencing").

Based on the foregoing, the PCR court's rejection of Petitioner's claim of IAC at sentencing was not an unreasonable application of *Strickland*. Petitioner is not entitled to

relief on Claim 40.

## EVIDENTIARY DEVELOPMENT

Petitioner requests discovery, expansion of the record, and/or an evidentiary hearing with respect to Claims 3, 7, 10, and 12, and all of his IAC claims.[22] *See* Dkt. 111 at 108-91. Respondents counter that Petitioner was not diligent in attempting to develop the factual bases of these claims in state court. The Court agrees. In addition, as set forth below, Petitioner has failed to demonstrate that any additional facts must be discovered for a fair resolution of the merits of his claims. Therefore, his requests for evidentiary development are denied.[23]

## I.   Legal Principles

In evaluating Petitioner's requests, the Court applies the relevant provisions of 28 U.S.C. § 2254(e)(2):

> If the applicant has failed to develop the factual basis of a claim in State court proceedings, the court shall not hold an evidentiary hearing on the claim unless the applicant shows that –
>
> (A) the claim relies on –
>
>> (I) a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable; or
>>
>> (ii) a factual predicate that could not have been previously discovered through the exercise of due diligence; and
>
> (B) the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense.

---

[22] Petitioner also "reserves the right" to seek evidentiary development with respect to Claim 1. Dkt. 111 at 108. Petitioner waived any request for such development by not including it in his merits brief as required by the Court's order. Dkt. 94 at 20.

[23] As previously noted, in resolving the merits of Petitioner's claims, the Court has reviewed the attachments to Petitioner's merits brief (Dkt. 111, Ex's 1-16); these attachments are the documents with which Petitioner seeks to expand the record.

Section 2254(e)(2) similarly limits a petitioner's ability to present new evidence through a motion to expand the record pursuant to Rule 7 of the Rules Governing Section 2254 Cases.[24]  *See Cooper-Smith v. Palmateer*, 397 F.3d 1236, 1241 (9th Cir. 2005) (holding that the conditions of § 2254(e)(2) generally apply to petitioners seeking relief based on new evidence, even when they do not seek an evidentiary hearing) (citing *Holland v. Jackson*, 542 U.S. 649, 652-53 (2004) (per curiam)).

The Supreme Court has interpreted subsection (e)(2) as precluding an evidentiary hearing in federal court if the failure to develop a claim's factual basis is due to a "lack of diligence, or some greater fault, attributable to the prisoner or the prisoner's counsel." *Williams v. Taylor*, 529 U.S. 420, 432 (2000).  A hearing is not barred, however, when a petitioner diligently attempts to develop the factual basis of a claim in state court and is "thwarted, for example, by the conduct of another or by happenstance was denied the opportunity to do so."  *Id.*; *see Baja v. Ducharme*, 187 F.3d 1075, 1078-79 (9th Cir. 1999) (allowing hearing when state court denied opportunity to develop factual basis of claim).

The diligence assessment is an objective one, requiring a determination of whether a petitioner "made a reasonable attempt, in light of the information available at the time, to investigate and pursue claims in state court." *Williams*, 529 U.S. at 435.  For example, when there is information in the record that would alert a reasonable attorney to the existence and importance of certain evidence, the attorney fails to develop the factual record if he does not make reasonable efforts to sufficiently investigate and present the evidence to the state court.  *See id*. at 438-39, 442; *Alley v. Bell*, 307 F.3d 380, 390-91 (6th Cir. 2002).  Absent

---

[24] Rule 7 authorizes a federal habeas court to expand the record to include additional material relevant to the determination of the merits of a petitioner's claims.  "The materials that may be required include letters predating the filing of the petition, documents, exhibits, and answers under oath, to written interrogatories propounded by the judge.  Affidavits may also be submitted and considered as part of the record." Rule 7(b), Rules Governing § 2254 Cases, 28 U.S.C. foll. § 2254.

unusual circumstances, diligence requires that a petitioner "at a minimum, seek an evidentiary hearing in state court in the manner prescribed by state law." *Williams*, 529 U.S. at 437; *see Bragg v. Galaza*, 242 F.3d at 1090.  The mere request for an evidentiary hearing, however, may not be sufficient to establish diligence if a reasonable person would have taken additional steps.  *See Dowthitt v. Johnson*, 230 F.3d 733, 758 (5th Cir. 2000) (counsel failed to present affidavits of family members that were easily obtained without court order and with minimal expense); *Koste v. Dormire*, 345 F.3d 974, 985-86 (8th Cir. 2003); *McNair v. Campbell*, 416 F.3d 1291, 1299-1300 (11th Cir. 2005).

Pursuant to *Townsend v. Sain*, 372 U.S. 293, 312-13 (1963), *overruled in part by Keeney v. Tamayo-Reyes*, 504 U.S. 1 (1992), *and limited by* 28 U.S.C. § 2254 (e)(2), a federal district court must hold an evidentiary hearing in a § 2254 case when: (1) the facts are in dispute; (2) the petitioner "alleges facts which, if proved, would entitle him to relief;" and (3) the state court has not "reliably found the relevant facts" after a "full and fair evidentiary hearing," at trial or in a collateral proceeding.  *See also Hill v. Lockhart*, 474 U.S. 52, 60 (1985) (upholding the denial of a hearing when petitioner's allegations were insufficient to satisfy the governing legal standard); *Bashor v. Risley*, 730 F.2d 1228, 1233-34 (9th Cir. 1984) (hearing not required when claim must be resolved on state court record or claim is based on non-specific conclusory allegations); *see also Landrigan*, 127 S. Ct. at 1940 ("Because the deferential standards prescribed by § 2254 control whether to grant habeas relief, a federal court must take into account those standards in deciding whether an evidentiary hearing is appropriate.").  Thus, Petitioner is entitled to an evidentiary hearing on a claim only if he alleges "facts that, if proven, would entitle him to relief." *Turner v. Calderon,* 281 F.3d at 890 (quoting *Tapia v. Roe,* 189 F.3d 1052, 1056 (9th Cir.1999)) ("[e]ntitlement to an evidentiary hearing based on alleged ineffective assistance, for example, requires a showing that if his allegations were proven at the evidentiary hearing, deficient performance and prejudice would be established").

- 88 -

**II.    Analysis**

With respect to Claims 3, 7, 10, and 12, Petitioner could have attempted to develop additional supporting evidence during his PCR proceeding, but instead raised the claims only on direct appeal. *See Bragg*, 242 F.3d at 1090 (finding lack of diligence based, in part, on petitioner's failure to take advantage of state collateral proceedings). Because Petitioner did not make a reasonable attempt to develop the factual bases of the claims in state court and cannot satisfy the requirements of §§ 2254(e)(2)(A) & (B), this Court is barred from granting an evidentiary hearing. But even if Petitioner had been diligent in state court, he is not entitled to evidentiary development.[25]

A.    <u>Claim 3</u>

Petitioner seeks an evidentiary hearing "during which he could develop evidence regarding his subjective understanding of the trial court's response to his motion to proceed pro per." Dkt. 117 at 65. Petitioner proposes to testify at the hearing and call as witnesses the trial judge, the prosecutor, and Ms. O'Neill. Dkt. 111 at 131. As discussed above, and as Petitioner now acknowledges, a transcript exists of the afternoon session of January 14, 1992, at which Petitioner agreed on the record to proceed with Ms. O'Neill as counsel with the assistance of local counsel. Petitioner does not identify the existence of any remaining disputed facts that are necessary to the Court's resolution of this claim.

B.    <u>Claim 7</u>

---

[25] Petitioner filed a second PCR petition in March 2002; the PCR court rejected the claims as precluded under Rule 32.2 of the Arizona Rules of Criminal Procedure. Petitioner contends that raising the claims and requesting evidentiary development in the successive PCR proceedings established diligence in state court. *See* Dkt. 111 at 123-24. The Court disagrees. It was not reasonable for Petitioner to delay his attempt to develop the factual bases of these claims in state court until two years after filing his federal habeas petition. *See* Arizona Rule of Criminal Procedure 32.5 (requiring petitioner to raise "every ground [for relief] known to him" in his PCR petition and provide documentary support for his allegations).

To support his claim of a *Batson* violation, Petitioner seeks discovery in the form of a deposition from the prosecutor and all documents related to Petitioner's case from the Mohave County Attorney's Office and an evidentiary hearing at which he intends to call the prosecutor and expert witnesses on jury issues and "cultural stereotyping and bias." Dkt. 111 at 133-34. The merits of this claim, however, are properly addressed on the existing record. As discussed above, defense counsel made a *Batson* objection during voir dire; the trial court heard the prosecutor's explanation and made its ruling, which was affirmed by the Arizona Supreme Court. Petitioner fails to identify any disputed facts that are material to this Court's evaluation of the reasonableness of the state courts' application of *Batson*. *See Hendricks v. Vasquez*, 974 F.2d 1099, 1103 (9th Cir. 1992) (hearing not required if the state court has reliably found the relevant facts or there are no disputed facts and the claim presents a purely legal question).

C.    Claim 10

With respect to his assertion that the trial court improperly limited his cross-examination of Detective Lent, Petitioner seeks discovery in the form of depositions from Lent, the prosecutor, defense counsel in the *Geary* case, and any other witness with knowledge of Lent's misconduct in a prior proceeding, as well as disclosure of all records from the Mohave County Sheriff's Office concerning the *Geary* matter. Dkt. 111 at 135-36. Petitioner also seeks to expand the record to include the partial transcript of Detective Lent's testimony at the 1986 *Geary* hearing (*see id.*, Ex. 16). *Id.* at 136. Finally, he requests an evidentiary hearing to elicit testimony from Lent, the prosecutor, counsel in *Geary*, all witnesses with knowledge of Lent's misconduct, and a witness who could challenge Lent's qualifications as a tracking expert. *Id.* at 137.

When analyzing a claim of trial court error based on the admission of evidence, a reviewing court assesses only the evidence that was before the trial court. This is strictly a record-based claim. *See Hendricks v. Vasquez,* 974 F.2d at 1103. Because this claim must

1    be decided on the state-court record, evidentiary development is not warranted.  Nor has

2    Petitioner identified disputed facts material to the Court's resolution of this claim.

3        D.    Claim 12

4        Petitioner seeks various forms of evidentiary development to support his allegation

5    of witness intimidation.  Dkt. 111 at 138-42.  These requests are denied.  The record is

6    sufficient for the Court to find, as detailed above, that this claim lacks both a factual basis

7    and legal merit.

8        E.    IAC claims

9        Petitioner requests extensive evidentiary development in support his ineffective-

10   assistance claims.  Dkt. 111, 142-91.  He  seeks to expand the record with the exhibits

11   attached to his merits brief.  He seeks discovery in the form of depositions from Ms.

12   O'Neill, co-defendant's counsel, the prosecutor, defense expert John Freeman, Detective

13   Lent, Detective Ingrassi, the crime scene photographer, defense counsel in *Geary*,

14   Petitioner's childhood friends, his sisters, and his father, as well as disclosure of records

15   from the Mohave County Public Defender's Office, the Mohave County Legal Defender's

16   Office, the Mohave County Superior Court, the Mohave County Jail, and local radio stations

17   and newspapers.  Petitioner requests an evidentiary hearing at which to present testimony

18   from many of these individuals as well as an expert witness on the representation of capital

19   defendants, an expert on statistics, an expert on sentencing, an expert on ineffective

20   assistance of counsel, witnesses with knowledge of Mohave County's jury selection

21   procedures, tracking expert Hardin, potential alibi witnesses Ward, Anthony, and Grinder,

22   and Drs. Morenz and Kolbell.

23       During the PCR proceedings, Petitioner requested an evidentiary hearing on his IAC

24   claims.  PCR petition at 31.  In support, Petitioner offered an affidavit from PCR counsel

25   summarizing a conversation she had with trial counsel in which Ms. O'Neill acknowledged

26   that her performance was hampered by her lack of experience.  *Id.*, Ex. A at 2.  The court

27

granted a hearing only with respect to the allegation that Ms. O'Neill was ineffective in failing to secure to the testimony of John Anthony.  ME 4/24/97.

This Court agrees with Respondents that Petitioner's failure to do more to develop the factual basis of his IAC claims in state court indicates a lack of diligence. Even assuming Petitioner diligently sought to develop the claims in state court, however, an evidentiary hearing is unnecessary because he has not alleged the existence of disputed facts which, if true, would entitle him to relief.  *Townsend*, 372 U.S. at 312-13.  Instead, he has offered only speculation as to what the proposed evidentiary development might reveal. *See United States v. Zuno-Acre*, 209 F.3d 1095, 1103 (9th Cir. 2000) (speculation is not a basis for an evidentiary hearing); *Daniels v. United States*, 54 F.3d 290, 293 (7th Cir. 1995) ("A hearing is not necessary if the petitioner makes conclusory or speculative allegations rather than specific factual allegations."); *Bashor*, 730 F.3d at 1234-35.

Petitioner contends that Ms. O'Neill performed deficiently at the guilt stage of trial. As the earlier discussion in this order demonstrates, the merits of that contention can be resolved without further evidentiary development.  The record adequately details counsel's performance.  Because these IAC claims can be "resolved by reference to the state court record," further evidentiary development is not warranted. *Totten v. Merkle*, 137 F.3d 1172, 1176 (9th Cir. 1998); *see Griffey v. Lindsey*, 345 F.3d 1058, 1067 (9th Cir. 2003) (hearing is not warranted if petitioner's claims can "be resolved by reference to the state court record and the documentary evidence); *Cardwell v. Greene*, 152 F.3d 331, 338-39 (4th Cir. 1998) (denying an evidentiary hearing on IAC claims where the petitioner "failed to forecast any evidence beyond that already contained in the record, or otherwise explain how his claim would be advanced by an evidentiary hearing.").

In *Totten*, the Ninth Circuit held that the petitioner was not entitled to an evidentiary hearing to determine whether trial counsel's decision not to pursue a mental impairment defense was deficient because the petitioner had failed to show that a hearing would shed

new light on the question of prejudice.  *Id.* at 1176-77.  Similarly, as discussed above, Petitioner has not shown that an evidentiary hearing would produce any new information demonstrating a reasonable probability that a more-capable performance by Ms. O'Neill would have produced a different verdict.  Even if Ms. O'Neill had litigated her motions, developed evidence, and handled witnesses in the manner Petitioner now asserts, there is no reasonable probability that the result of the trial would have been different.

The same analysis applies to Petitioner's claims of IAC at sentencing.  Counsel argued and presented testimony concerning Petitioner's unfortunate childhood and his psychological condition.  The record is sufficient to resolve this claim because it clearly shows that counsel presented a strong case in mitigation based on a thorough investigation of Petitioner's background.  *See Johnson v. Luebbers*, 288 F.3d 1048, 1058-60 (8th Cir. 2002) (district court did not abuse its discretion in denying petitioner's request for an evidentiary hearing on claim that counsel was ineffective for failing to present mitigating evidence of petitioner's mental health and diminished mental capacity where record already contained facts necessary to resolve claim); *Pizzuto v. Arave*, 280 F.3d 949, 974 (9th Cir. 2002) ("Because Pizzuto points to nothing substantial on any score that further investigation or preparation would have produced, there is nothing to resolve and thus no reason for an evidentiary hearing.").  In addition, for the reasons set forth in the Court's consideration of the merits of Claim 40, a review of the entire record indicates that the facts alleged by Petitioner, even if proved true, would not entitle him to relief on this claim.  *See Landrigan*, 127 S. Ct at 1940.

In sum, Petitioner has not indicated what disputed issues of material fact exist, let alone shown that if such facts were resolved in his favor he would be able to establish IAC.  The record – which includes the Court's review of Ms. O'Neill's declaration – contains sufficient information for the Court to assess the reasonableness of counsel's performance, evaluate any possible prejudice, and determine whether the PCR's court's rejection of

Petitioner's IAC claims entitles him to relief under § 2254(d).  Therefore, the Court denies Petitioner's requests for evidentiary development on his IAC claims.

## CERTIFICATE OF APPEALABILITY

In the event Petitioner appeals from this Court's judgment, the Court on its own initiative has evaluated the claims within the petition for suitability for the issuance of a certificate of appealability.  *See* 28 U.S.C. § 2253(c); *Turner v. Calderon*, 281 F.3d at 864-65.

Rule 22(b) of the Federal Rules of Appellate Procedure provides that when an appeal is taken by a petitioner, the district judge who rendered the judgment "shall" either issue a certificate of appealability ("COA") or state the reasons why such a certificate should not issue.  Pursuant to 28 U.S.C. § 2253(c)(2), a COA may issue only when the petitioner "has made a substantial showing of the denial of a constitutional right."  This showing can be established by demonstrating that "reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner" or that the issues were "adequate to deserve encouragement to proceed further."  *Slack v. McDaniel*, 529 U.S. 473, 484 (2000) (citing *Barefoot v. Estelle*, 463 U.S. 880, 893 & n.4 (1983)).  For procedural rulings, a COA will issue only if reasonable jurists could debate (1) whether the petition states a valid claim of the denial of a constitutional right and (2) whether the court's procedural ruling was correct.  *Id.*

The Court finds that reasonable jurists, applying the deferential standard of review set forth in the AEDPA, which requires evaluation state court decisions in the light of clearly established federal law as determined by the United States Supreme Court, could not debate its resolution of the merits of Petitioner's claims as set forth in this Order.  Further, for the reasons stated in the Court's Order regarding the procedural status of Petitioner's claims filed on April 14, 2006 (Dkt. 94), the Court declines to issue a COA with respect to any claims that were found to be procedurally barred.

**IT IS ORDERED:**

1.      Petitioner's Amended Petition for Writ of Habeas Corpus (Dkt. 20) is **denied**.

2.      The Clerk of Court shall enter judgment accordingly.

3.      The stay of execution issued by this Court on October 12, 1999, is vacated.

4.      A Certificate of Appealability is denied

5.      The Clerk of Court shall forward a copy of this Order to Rachelle M. Resnick, Clerk of the Arizona Supreme Court, 1501 W. Washington, Phoenix, AZ 85007-3329.

DATED this 9th day of April, 2008.

David G. Campbell
United States District Judge